COFFIN *v.* OGDEN.

1. When, in a patent case, a person claims as an original inventor and the defence is a prior invention by the defendant, if the defendant prove that the instrument which he alleges was invented by him was complete and capable of working, that it was known to at least five persons, and probably to many others, that it was put in use, tested, and successful, he brings the case within the established severe tests required by law to sustain the defence set up.
2. Barthol Erbe anticipated William S. Kirkham in the invention of door locks with reversible latches.

APPEAL from the Circuit Court for the Southern District of New York, in which court Coffin filed a bill against Ogden et al. to enjoin them from making door locks of a certain kind, the exclusive right to make which he alleged belonged by the assignment of a patent right to him.

The case was one chiefly of fact, involving the question of priority of invention. The court below was of the opinion that the complainant, or rather the person under assignment of whose patent he claimed and was working, had been anticipated in his invention; and dismissed the bill. From that decree the defendants took this appeal.

*Mr. George Gifford, for the appellant; Mr. B. F. Thurston, contra.*

Mr. Justice SWAYNE stated the case, recited the evidence, and delivered the opinion of the court.

The appellant was the complainant in the court below, and filed this bill to enjoin the defendants from infringing the

patent upon which the bill is founded. The patent is for a door lock with a latch reversible, so that the lock can be applied to doors opening either to the right or the left hand. It was granted originally on the 11th of June, 1861, to Charles R. Miller, assignee of William S. Kirkham, and reissued to Miller on the 27th of January, 1863. On the 10th of June, 1864, Miller assigned the entire patent to the complainant. No question is raised as to the complainant's title, nor as to the alleged infringement by the defendants. The answer alleges that the thing patented, or a material and substantial part thereof, had been, prior to the supposed invention thereof by Kirkham, known and used by divers persons in the United States, and that among them were Barthol Erbe, residing at Birmingham, near Pittsburg, and Andrew Patterson, Henry Masta, and Bernard Brossi, residing at Pittsburg, and that all these persons had such knowledge at Pittsburg. The appellees insist that Erbe was the prior inventor, and that this priority is fatal to the patent. This proposition, in its aspects of fact and of law, is the only one which we have found it necessary to consider.

Kirkham made his invention in March, 1861. This is clearly shown by the testimony, and there is no controversy between the parties on the subject.

It is equally clear that Erbe made his invention not later than January 1st, 1861. This was not controverted by the counsel for the appellant; but it was insisted that the facts touching that invention were not such as to make it available to the appellees, as against the later invention of Kirkham and the patent founded upon it. This renders it necessary to examine carefully the testimony upon the subject.

*Erbe's* deposition was taken at Pittsburg upon interrogatories agreed upon by the parties and sent out from New York. He made the lock marked H. E. (It is the exhibit of the appellees, so marked.) He made the first lock like it in the latter part of the year 1860. He made three such before he made the exhibit lock. The first he gave to Jones, Wallingford & Co. The second he sent to Washington, when he applied for a patent. The third he made for a

friend of Jones. He thinks the lock he gave to Jones, Wallingford & Co. was applied to a door, but is not certain.

*Brossi.* In 1860 he was engaged in lockmaking for the Jones and Nimmick Manufacturing Company. He had known Erbe about seventeen years. In 1860 Erbe was foreman in the lock shop of Jones, Wallingford & Co., at Pittsburg. In that year, and before the 1st of January, 1861, he went to Erbe's house. Erbe there showed him a lock, and how it worked, so that it could be used right or left. He says: "He (Erbe) showed me the follower made in two pieces. One piece you take out when you take the knob away. The other part—the main part of the follower—slides forward in the case of the lock with the latch, so you can take the square part of the latch and turn it around left or right, whichever way a person wants to." He had then been a lockmaker eight years. He examined the lock carefully. He had never seen a reversible lock before. He has examined the exhibit lock. It is the same in construction. The only difference is, that the original lock was made of rough wrought iron. It was a complete lock, and capable of working. Erbe thought it a great thing. Erbe showed him the lock twice afterwards at Jones, Wallingford & Co's. He saw such a lock attached to the office door there and working, but don't know whether it was the first lock made or one made afterwards.

*Masta.* In 1860 he was a patternmaker for Jones, Wallingford & Co. Had known Erbe fourteen or fifteen years. Erbe showed him his improvement in reversible locks New Year's day, 1861. He examined the lock with the case open. "You had to pull out the spindle, and the hub was fitted so that it would slide between the spindle and the plate and let the latch forward." . . . "The whole hub was made of three pieces. One part was solid to the spindle or hub shanks, and then the hub that slides between the plate and case, and a washer at the other side of the spindle." "There is not a particle of difference between the exhibit and the original lock. It is all the same." He identifies the time by the facts that he commenced building a house in 1861,

and that year is marked on the water conductor under the roof.

*Patterson.* Until recently he was a manufacturer of locks and other small hardware. In the year 1860 he was the superintendent of the lock factory of Jones, Wallingford & Co., and their successors in Pittsburg. He had known Erbe since 1856. About the 1st of January, 1861, Erbe showed him an improved reversible lock of his invention like the exhibit lock. The improvement "consisted in constructing the hub or follower, so that when the spindle was withdrawn, the hub would slide forward between the cases so that the head of the latch would protrude beyond the face of the lock, so as to permit its reversal from right to left; the latch-head being connected with the yoke by a swivel joint, so that it might be reversed. . . . It was our uniform practice to put our new locks on the doors about the office to test them, and I believe that one was put on; but at this distance of time I cannot say positively that it was."

There is no proof that Erbe made any locks according to his invention here in question but those mentioned in his testimony. He applied for a patent in 1864, and failed to get it. Why, is not disclosed in the record.

The appellants called no witnesses at Pittsburg or elsewhere to contradict or impeach those for the appellees. Brossi was subjected to a rigorous cross-examination, but, in our judgment, it in nowise diminishes the effect of his testimony in chief. The counsel for the appellants asked with emphasis, in the argument here, why the defendants had not called Jones, of the firm of Jones, Wallingford & Co.? The question was well retorted, why was he not called by the other side? He does not appear in a favorable light. He prevented Erbe, who was in his employ, from going to New York to testify in behalf of the defendants, and avowed a determination to prevent, if it were possible, their obtaining the testimony of Brossi, Masta, and Patterson. It is difficult not to regard him with a feeling akin to that which attends the presumptions *in odium spoliatoris.* We entertain no doubt that the testimony of all these witnesses is true in

every particular, including the statement of Brossi as to putting the lock on the door. If that were false, doubtless Jones would have been called to gainsay it. His hostility to the defendants is a sufficient reason for their not calling him for any purpose.

The case arose while the Patent Act of 1836 was in force, and must be decided under its provisions. The sixth section of that act requires that to entitle the applicant to a patent, his invention or discovery must be one " not known or used by others before his invention or discovery thereof." The fifteenth section allowed a party sued for infringement to prove, among other defences, that the patentee " was not the original and first inventor of the thing patented, or of a substantial and material part thereof claimed to be new."

The whole act is to be taken together and construed in the light of the context. The meaning of these sections must be sought in the import of their language, and in the object and policy of the legislature in enacting them.* The invention or discovery relied upon as a defence, must have been complete, and capable of producing the result sought to be accomplished; and this must be shown by the defendant. The burden of proof rests upon him, and every reasonable doubt should be resolved against him. If the thing were embryotic or inchoate; if it rested in speculation or experiment; if the process pursued for its development had failed to reach the point of consummation, it cannot avail to defeat a patent founded upon a discovery or invention which was completed, while in the other case there was only progress, however near that progress may have approximated to the end in view. The law requires not conjecture, but certainty. If the question relate to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility.† The prior knowledge and use by a single person is sufficient.

---

* Gayler *v.* Wilder, 10 Howard, 496.

† Reid *v.* Cutter, 1 Story, 590.

The number is immaterial.*   Until his work *is done*, the inventor has given nothing to the public.   In *Gayler* v. *Wilder* the views of this court upon the subject were thus expressed: " We do not understand the Circuit Court to have said that the omission of Conner to try his safe by the proper tests would deprive it of its priority; nor his omission to bring it into public use.   He might have omitted both, and also abandoned its use and been ignorant of the extent of its value; yet if it was the same with Fitzgerald's, the latter would not, upon such grounds, be entitled to a patent; provided Conner's safe and its mode of construction were still in the memory of Conner before they were recalled by Fitzgerald's patent."   Whether the proposition expressed by the proviso in the last sentence is a sound one, it is not necessary in this case to consider.

Here it is abundantly proved that the lock originally made by Erbe "was complete and capable of working."·  The priority of Erbe's invention is clearly shown.   It was known at the time to at least five persons, including Jones, and probably to many others in the shop where Erbe worked; and the lock was put in use, being applied to a door, as proved by Brossi.   It was thus tested and shown to be successful.   These facts bring the case made by the appellees within the severest legal tests which can be applied to them. The defence relied upon is fully made out.

DECREE AFFIRMED.

---

* Bedford *v.* Hunt, 1 Mason, 302.