STAFFORD et al. v. MORRIS et al.

(Circuit Court, N. D. New York. April 11, 1908.)

No. 7,059.

**1. PATENTS—INFRINGEMENT—CIRCULAR-KNITTING MACHINE.**

The Stafford and Holt patent, No. 759,928, for improvements in circular-knitting machines by which each swinging throat cam is independently moved while the machine is at work by its separate pattern chain for the purpose of producing fabrics of a large variety of patterns and stitches, was not anticipated, and, while covering a combination of old elements, discloses patentable invention; the combination being new with a new mode of operation and producing a new and useful result. Also, *held* infringed.

**2. SAME—INVENTION—EVIDENCE OF INVENTION.**

The fact that the product of a machine made by a new combination of old elements goes into general use and displaces others is some evidence, of greater or less weight, that the new combination involved invention.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 39.]

In Equity. Suit to restrain alleged infringement of United States letters patent No. 759,928, dated May 17, 1904, application filed February 27, 1903, for circular-knitting machines, and for an accounting.

Risley & Love, for complainants.
Alfred Wilkinson, for defendants.

RAY, District Judge. The defendants above named are users of the knitting machines alleged to infringe, which are made and sold by the H. P. Snyder Manufacturing Company, which company is defending this action. Hence I shall speak of that company as defendant. This will be understood.

The alleged invention relates to improvements in circular-knitting machines, and in the patent it is illustrated as applied to multiple-fed machines; that is, that several threads are shown as being fed at the same time to the needles. The patentees, Walter Stafford and Robert C. Holt, declare that the particular purpose of the invention is to produce a circular rib-knitting machine in which certain of the needles of one set—preferably, for instance, the dial-needles—can be made, some of them, to knit plain, others to cause a tuck-stitch to be made, and some to skip the thread delivered from the same feed to such needles successively and at the same revolution of the machine and by which any number of such stitches may be produced at the same point and by which the stitch may be changed from one to another kind or form at any point of the operation. They also say:

"Where we speak of a needle making a 'tuck stitch' or 'welt stitch,' we wish to be understood as meaning that the needle is operated at that point in the operation to tuck the thread or to skip the thread, though properly the stitch is not completed until combined with the succeeding plain stitch formed by that needle, i. e., the needle is operated to take a thread without casting its old loop or to miss the thread without casting its loop instead of casting an old loop over a new loop to form a plain stitch."

161 F.—8

The operation of the machine is described with great particularity. The patent has nine claims, six of which are in issue, viz., the second, fifth, sixth, seventh, eighth, and ninth. These read as follows:

"2. In a circular-knitting machine, a dial, long and short needles disposed therein, a cam-plate, cams seated thereon providing an inner and an outer heel-path for the needles, said cam-plate being constructed in a series of duplicate sectors, a throat-cam provided in each sector and in each path, the said throat-cams being pivoted at one end and provided with a path for needle-heels therethrough, means for adjusting each throat-cam to operate in the making of a plain, a tuck, or a welt stitch and to adjust adjacent needles of different form to either of such positions, said adjusting means comprising pattern-chains and operative connections between the pattern-chains and the throat-cams and means for operating the pattern-chains, in combination, substantially as described."

"5. In a circular-knitting machine, provided with a dial, pattern-chains, means for operating the same, needles of different length and a cam-plate provided with an annular groove for the heels of each set of needles, a plurality of throat-cams, each provided with a needle-heel groove therethrough, disposed in equal sectors of the cam-plate, one of such throat-cams being in the heel-path of each length needle and radially adjacent, the said throat-cams being adjustable to dispose adjacent needles to different operative positions to cause a plain, a tuck or a welt stitch to be made by one or more needles in the operation of the machine, means for adjusting the throat-cams comprising operative connections between each and its proper pattern-chain, substantially as described.

"6. In a circular-knitting machine, provided with a cylinder, a dial, pattern devices, means for operating the same and a cam-plate provided with annular grooves for the heels of different length needles, cams constructed with heel-controlling grooves therethrough, pivotally mounted on the cam-plate in pairs adjacent to the radial line between the center of the cam-plate and the yarn-feed, there being a yarn-feed for each such pair of throat-cams, said yarn-feeds, operative connections between each throat-cam and its proper pattern device to shift each throat-cam separately to dispose the through-passing needles to skip or to take the yarn of the adjacent feed, in combination, substantially as described.

"7. In a circular-rib-knitting machine provided with a cylinder, a dial, a cam-plate provided with inner and outer needle-heel grooves, pattern-chains and means for operating the same, a plurality of throat-cams constructed with grooves therethrough for the passage of needle-heels, the said throat-cams being seated one in the path of each needle and at different radial distances from the center of the cam-plate, needles arranged with their heels in the inner and outer heel-grooves, operative connections between each throat-cam and its pattern-chain to shift each throat-cam to cause one interpassing needle to ship the yarn from the adjacent feed and a succeeding needle to knit such yarn from the same feed, such needles being of a length to travel some in each of such needle-heel paths, substantially as described.

"8. In a continuous rotary knitting-machine provided with a cylinder and cylinder-needles, pattern wheels and chains and means for operating the same, a dial with different length needles interposed therein, and a cam-plate, the combination of pivotally-mounted throat-cams arranged in pairs on the cam-plate there being one pair for each duplicate sector of the cam-plate, duplicate sectors of the cam-plate, means for adjusting the throat-cams independently of each other to either of their operative positions at any instant in the revolution of the dial to shift the needles passing therethrough to their proper position in the making of a plain, a tuck, or a welt stitch, said means comprising operative connections between the pattern-chains and the throat-cams, in combination, substantially as described.

"9. In a knitting-machine, a plurality of yarn-feeds, a dial, needles of a plurality of forms therein, cams engaging the heels of each form of needle, a plurality of throat-cams for each yarn-feed pivotally mounted to project or retract each needle independently to co-operate in making a plain, a tuck, or welt stitch, operative means to project or retract the throat-cams, said means

comprising a pattern device and connections therefrom to each throat-cam, in combination, substantially as shown."

The patentees also expressly state that they do not limit themselves to the illustrations which they have made of their device, nor to the style of machine or number of cams and feeds exhibited as the improvement is capable of various applications and in different forms and positions without departure from the scope and spirit of the invention.

The following from the specifications summarizes quite well the salient features of the invention:

"Each throat-cam can be moved while the machine is at work by its own separate connection with its own pattern-chain and independently of each other throat-cam. As each needle comes to each throat-cam it may be projected so that it will cast off and make a plain stitch, or it may be projected a lesser distance and a tuck stitch be made, or it may be withdrawn and not take thread and permit the making of a welt stitch. These cams may be moved in unison, and the needles against one set of cams all make the same kind of stitch, or the cams may be moved oppositely, and thus make different stitches, or some can be moved one way and some another, any one or more of the twelve throat-cams in any one of the three positions for any number of revolutions or part of a revolution of the machine. Each cam may be changed at any time in the operation to any one of its three possible positions. So, too, the needles operated by these cams may be arranged in any desired way or with any desired space between them, governed only by the radial spaces of the dial-plate. It will thus be seen that we have produced an improved machine in which the stitches formed by the needles may be changed in any desired manner by the disposition of the throat-cams during the operation of the machine, and it will be obvious that we have thus made it possible to produce fabrics of a very large variety, grouping the possible kinds of stitches according to any desired pattern."

It is claimed, and is conceded, that this knitting-machine produces a fabric known as the "pineapple pattern," which had not been made before, and which it is impossible to make on any other machine of the circular-knitting variety. It is conceded that the various elements of the complainants' device or machine are old, but it is insisted that this is a new combination with novel features producing both a new result and some old results in a new and far better way. Of course, this is not a new art. It may be said that it is "an old and a crowded art." This fact does not detract, however, from the merit of the patent in suit, for to produce a new and useful result from a new combination of old elements demands, ofttimes, a high degree of skill and mental conception. The prominent new feature in the complainants' patent and invention consists in the independent operation of the various swinging throat-cams at the right instant and at the right point for producing the pineapple stitch, an entirely new stitch in a rotary-knitting machine.

In this art we have the stationary head machines and the rotary head machines. In both of these machines each swinging throat-cam has three distinct movements, according to the design of the pattern-chain. The throat-cams may be moved in the same direction, in directions opposite from each other, and towards each other. Each cam can be independently moved in the same direction or in opposite directions. The cams are automatically swung into position to make either one of the three stitches, plain stitch, tuck stitch, and welt stitch,.

or any desired combination of these three stitches. This is a new op-
eration and a new and improved result. We have swinging throat-cams
located on the under face of the dial in radial lines from the center of
the dial with suitable mechanism for operating sets of cams, swinging
throat-cams, and there is included in this construction the necessary
elements to produce the combination of the three stitches mentioned
in a tubular knitted fabric, in the same course by the independent
movement of each throat-cam. This was new. We have the raised or
"pineapple" stitch fabric, so called because of its resemblance to the
outer surface of that fruit. The utility, marketability, and commer-
cial success of the product is not denied. As already stated, we have
a new combination of old elements with a different or new mode of
operation producing a new and useful result.

This constitutes strong and persuasive evidence of invention. Mere
mechanical skill was not adequate for the undertaking. There was a
mental conception with which was combined and utilized mechanical
skill to provide means for carrying out and making useful this con-
ception. Walter Stafford, a witness for the complainant, said:

"Q. 57. Please state in your own language the novelty which you claim
exists in the patent in suit.

"A. According to my understanding it consists in pairs of throated cams
located in the cam circles on radial lines; each cam being independently
operated by the pattern devices, and their connection for independently con-
trolling the needles in each set by means of which the threads can be ac-
cumulated and carried over and united to make the pineapple stitch. In this
operation some of the needles accumulate the threads, and some of them are
held from taking thread, and by this means pineapple-stitch fabric is con-
structed.

"Q. 58. Do you understand that the throated cam was broadly new at the
time you perfected your invention?

"A. I do not.

"Q. 59. State what functions the throated cams performed in rotary-knitting
machines prior to your invention?

"A. They were used for making a welt or hem on knitted fabric; that is
when they came to the end of the garment, they were used to throw all the
needles of the dial out of action, and hold them out until a hem of sufficient
length had been made by the cylinder needles, which when thrown in they
united the stitches to complete the hem which then would not ravel. In this
class of machines there was but one row of cams and one length of dial
needles. These cams were operated by the pattern mechanism and its con-
nection, as shown in the McMichael patent, and, perhaps, some others."

On cross-examination the witness said that the throat-cam itself was
old before the invention of the patent in suit, and that these throat-
cams were in use in a machine having a single cam way or cam race
both to project and retract the needles, and were there used to project
the needles to tuck and to cast off and to retract them to welt. Also:

"Q. Then if you took those old throat-cams and substituted them for all the
movable or pivoted cams shown in this blue print, would you have substantial-
ly the cam-plate of your patent in suit?

"A. It might require some modifications of the cams, but, substantially, I
should say, 'Yes.'"

This is not to be understood as a statement that all the patentees
did was to transfer the throat-cams from one machine to another, or
to substitute throat-cams in place of pivoted cams, or plain swinging
cams. There may be invention in transferring an old element from

one place to another if done to meet a new or novel exigency and serve a new purpose in its new sphere of action, but more than that was done here, something very different. We have a new arrangement, a new operation, and a new and useful result. The witness Stafford subsequently explained that the cams would have to be changed in shape and means provided to separately connect each cam, and that the pattern mechanism would have to be changed; in short, that means for independently operating the cams would have to be provided. All this Stafford and Holt did. The first and main defense is that in 1895 and 1896 there was designed, completed, and operated for Snyder and Fisher a machine practically identical with the machine of the patent in suit; that it was set up and operated for a short time, and its capabilities publicly exhibited and commented on. One George W. Bellinger says that he talked about it with several persons, and he testified, among other things:

"I think I said a number of times that Fisher had a great head on him to get a circular machine that would make that fabric and one that would make so many different styles."

Also, that others "brought up the subject of this machine and spoke about the remarkableness of it, and I acquiesced to it." There is no pretense that other machines were made like it, or that it was utilized or put to work, except for a short time to show what it would do, or that any goods were made with it and put on the market. The claim is that when it was completed, at an expense of hundreds of dollars, when it had shown its wonderful capabilities, had demonstrated its "remarkableness," had set all who saw it to talking of its accomplishments, that it was packed away with the thought that at some time it might be brought out and utilized. In point of fact, it never was brought out or utilized until used in evidence in this case long after complainants' patented machine had been put in operation and had produced an article which met with great demand and commercial success and, to an extent, drove other fabrics out of the market. While some five or six witnesses give evidence tending to support the contention, I cannot credit it. It is too improbable. That an intelligent man would pack away, hide such a machine, one which, to an extent at least, would have revolutionized the trade in such fabrics, without making and putting on the market any of the great variety of novel and attractive articles it was capable of producing, is simply incredible. And why was it that it was not brought out and put in operation when the complainants' machine first made its appearance? Why was this left to sleep in idleness?

When complainants' machine came out, and the H. P. Snyder Company, now defending this action, undertook to make a machine that would do the same work, instead of bringing forward this old machine, which it says it had already made, Snyder & Co. worked for weeks, if not months, and produced a machine which would not work, would not do the work of complainants' machine; but finally there was produced to the defendants' workmen, engaged on these machines in trying to make them work, a hand print, one made by pressing a paper down on the cams of one of those cylinders like complainants' cylinders, and then there was no further trouble. It is claimed that

Snyder & Co. obtained this hand print of the cam arrangement from one of complainants' machines in some way, opportunity being shown, and thus was able to copy complainants' machine. There is evidence tending to show that the cap or cylinder carrying the cams alleged to have been made in 1895 or 1896 is new and could not have been made at the time claimed. But, however that may be, it was admitted on the final hearing that this old machine produced by defendant will not do the work of complainants' machine, and this is evidence of a material and substantial difference.

This first defense is not established to my satisfaction and beyond a reasonable doubt, as it must be. Barbed Wire Patent Cases, 143 U. S. 275, 285, 12 Sup. Ct. 443, 36 L. Ed. 154; Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Cantrell v. Wallick, 117 U. S. 689, 695, 696, 6 Sup. Ct. 970, 29 L. Ed. 1017. In this last case it is said (pages 695, 696 of 117 U. S., pages 973, 974 of 6 Sup. Ct. [29 L. Ed. 1017]):

"The burden of proof is upon the defendants to establish this defense, for the grant of letters patent is prima facie evidence that the patentee is the first inventor of the device described in the letters patent and of its novelty. Smith v. Goodyear Dental Vulcanite Co., 93 U. S. 486, 23 L. Ed. 952; Lehnbeuter v. Holthaus, 105 U. S. 94, 26 L. Ed. 939. Not only is the burden of proof to make good this defense upon the party setting it up, but it has been held that 'every reasonable doubt should be resolved against him.' Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 821; Washburn v. Gould, 3 Story, 122, 142, Fed. Cas. No. 17,214."

I am satisfied that Stafford and Holt were the original and first inventors of the patented device, or knitting-machine in question, that it was not made by H. P. Snyder Manufacturing Company, and that the combination discloses patentable invention. There is a long line of unbroken authority that patentable invention is frequently shown in a new combination of old elements when a new and useful result is obtained. Seymour v. Osborne, 11 Wall. 541, 20 L. Ed. 33, per Clifford, J.; Webster Loom Co. v. Higgins, 105 U. S. 580, 599, 26 L. Ed. 1177; The Barbed Wire Cases, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Keystone Mfg. Co. v. Adams, 151 U. S. 139, 14 Sup. Ct. 295, 38 L. Ed. 103.

In Seymour v. Osborne, supra, Mr. Justice Clifford said:

"Improvements in machines protected by letters patent may also be mentioned, of a much more numerous class, where all the ingredients of the invention are old, and where the invention consists entirely in a new combination of the old ingredients, whereby a new and useful result is obtained, and many of them are of great utility and value and are just as much entitled to protection as those of any other class. Such a combination is sufficiently described if the ingredients of which it is composed are named, their mode of operation given, and the new and useful result to be accomplished pointed out, so that those skilled in the art and the public may know the extent and nature of the claim, and what the parts are which co-operate to produce the described new and useful result."

Scores of cases might be cited where this is declared. However, a mere aggregation of old elements, even with an improved final result, is not invention. When old elements, each having a function of its own, are assembled into one device, and each there performs its old function in the old way, no one being qualified by the other, and the

final result is simply the combined result, several results added together, there is no invention. But that is not this case.

So all improvements in devices, or processes, or means for producing a given result, are not invention. In a new combination of old elements there must be not merely an improved result or a new result, but a new mode of operation as well, and this should disclose more than the application of mere mechanical skill. The new combination of old elements, the new arrangement of parts, and the new and beneficial result are not per se invention. They are evidence of invention. These facts are evidence from which the court may find the necessary mental conception, beyond the province of the skilled mechanic, which constitutes invention. Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177, where it is said:

"It may be laid down as a general rule, though not perhaps an invariable one, that if a new combination and arrangement of known elements produces a new and beneficial result, never attained before, it is evidence of invention."

So the fact that the product of such a new combination of old elements goes into quite general use and displaces others previously used for the same or analogous purposes is some evidence of invention in the making of the new combination. It does not establish invention. It is merely evidence which may have very little weight, or it may be quite persuasive. Barbed Wire Patent Cases, 143 U. S. 275, 284, 12 Sup. Ct. 443, 36 L. Ed. 154; Smith v. Goodyear D. V. Co., 93 U. S. 486, 495, 23 L. Ed. 952; Magowan v. N. Y. Belting Co., 141 U. S. 332, 343, 12 Sup. Ct. 71, 35 L. Ed. 781. The court should look to the state of the art at the time the patentees made their alleged invention, its progress and development, as well as at what the patentees actually did in selecting and assembling the elements of the new combination, and then at the results accomplished. If it is established that mechanical skill in that art and department of mechanics was not competent to do all that was done, and there is a new mechanical operation and new and useful results, then the court is likely to be convinced that there was a mental conception accompanied by application and execution that amounts to patentable invention. And a presumption that there was patentable invention, as well as that the patentee was the first inventor, goes with every patent issued, and must be overcome by substantial evidence of some kind. American Sulphite Pulp Co. v. De Grasse Paper Co. (C. C. A.) 157 Fed. 660, 663. In that case the court said:

"It seems to be thought that it was incumbent upon the complainant to establish by extrinsic testimony that it involved invention to take a lining from an open vessel where it was subjected only to boiling heat and comparatively slight pressure and subject it to steam heat, tremendous pressure, and the action of various gases engendered by the process; but we do not so understand the law. The grant of a patent is presumptive evidence that the patentee is entitled to the monopoly fairly covered by his claims. He who asserts to the contrary must prove his assertions. It is only when the court, by bringing to its aid matters of common knowledge, is convinced that the patent is void on its face, that such proof can be dispensed with."

It sometimes happens that this evidence appears on the face of the patent itself, but such cases are rare. Here, to sustain defendants' second defense, want of patentable invention in view of the prior art, we

have some prior patents, but very little evidence in explanation of them. It has been held that prior patents will not be considered at all in the absence of evidence explaining the operation of such patented devices. However, this rule ought not to be applied in cases where intelligent minds ought to be able to comprehend them; that is, where they are self-explanatory. Here some of the devices are, and some are not. The court cannot take judicial notice of the prior art on the question of the validity of the patent in suit, unless that prior art be in evidence, except as to matters of general knowledge, not even where that prior art appears and is fully disclosed and explained in the opinions of the court in prior litigations by the same plaintiffs as to the validity of the same patent. American Sulphite Pulp Co. v. De Grasse Paper Co. (C. C. A.) 157 Fed. 660; N. Y. Belting Co. v. N. J. Rubber Co., 137 U. S. 445, 11 Sup. Ct. 193, 34 L. Ed. 741.

I have examined the patents in evidence here and the machines and their actual practical operation and the file wrapper of the patent in suit, and have arrived at the conclusion that the patent in suit discloses patentable invention. It is true that a considerable number of changes were made in claims and specifications in the Patent Office. But the file wrapper discloses that the most of these changes related to matters of description, the use of words to express ideas, and not to a change or substantial limitation and restriction of the true invention claimed in the first instance and finally allowed. It is also true that the patentees claimed some things that were not allowed, but it is incumbent upon a claimant in the Patent Office to include everything he conceives himself entitled to. That office is quite free, as a rule, to restrict and limit the claims as made in the first instance, but it is a very rare occurrence for it to suggest that they be broadened. What is not claimed, even if the omission includes patentable matter, is deemed to have been surrendered to the public. Keystone Bridge Co. v. Phœnix Iron Co., 95 U. S. 274, 278, 24 L. Ed. 344; Universal Brush Co. v. Sonn, 154 Fed. 665, 668, 669, 83 C. C. A. 414.

This patent in suit is more than a mere extension, a carrying forward, of the ideas of the patent to Nye & Tredick, assignees of Frank A. Nye, No. 556,514 of March 17, 1896, for circular-knitting machine. That was directed more particularly to an arrangement of the cams and to a peculiar manner of adjusting the same, having in view the production of a fabric bearing on its surface a polka-dot design, a stripe, or a combination of the two. This invention comprised a series of successively operating cams adapted to be set in different positions relatively to each other to cause certain of said cams to knit off and the remainder to tuck and to be reversed as to their relative positions to knit off and tuck alternately; the object being to lay yarn of different colors to the needles in such manner as to cause certain stitches of one color to appear on the surface of the fabric of the prevailing color, and the result being a fabric of one color having on its surface a dot or point made of the stitch of the other color. This necessarily included the details of construction and combination of parts there described and claimed. I have also examined the patent to Williams, No. 688,275, the patents to McMichael and Wildman, No. 508,965, and No. 556,514, patent to Townsend, No. 539,837, but fail to find such

combinations and modes of operation in the prior art that it can be said the patent in suit was not a distinct advance in the art disclosing patentable invention. The Patent Office clearly had the whole prior art before it and gave these claims careful attention and consideration. To my mind the file wrapper of a patent, which shows that careful examination was made and due deliberation had, is more persuasive on the question of patentable invention than one which shows nothing at all. Of course, it is presumed that the Patent Office does its whole duty, but an ex parte examination of the prior art is not apt to be as thorough and exhaustive as one accompanied by an animated correspondence and discussion between the examiner and applicant.

The third defense is that, conceding patentable invention, there is no infringement by the defendant. As already shown by quotation from the specifications of the patent in suit:

"Each throat-cam can be moved while the machine is at work by its own separate connection with its own pattern-chain and independently of each other throat-cam. * * * Each cam may be changed at any time in the operation to any one of its three possible positions. * * * It will be thus seen that we have produced an improved machine in which the stitches formed by the needles may be changed in any desired manner by the disposition of the throat-cams during the operation of the machine," etc.

The defendant, referring to this, says:

"This operation cannot be performed by 'Defts.' Cam-Plate.' That machine does not have independent connections for each cam, and does not have a separate pattern chain for each. The cams are connected up in pairs (not independently) by means of studs (upwardly extending through slots in the cam-plate) to the little irregular plates of thin metal, called the 'cam-shifting plates,' pivoted on top of the machine and connected each by a strap to a compound lever. When each cam-shifting plate is moved, both of its cams are moved simultaneously. The operation of the cams cannot be changed while the machine is in operation. In fact, after the machine is set up to make one kind of fancy-stitch fabric, the operation of the machine cannot be changed at all. To make a different fabric, all these cam-shifting plates would have to be changed, and the cams connected up differently. Each machine as sent out of the shop is adapted to make one fabric only, and to change to another would require the services of an expert machine builder or adjuster and a reorganization of the aforesaid connections and operating mechanism. Defendants' machine has only one pattern chain, which, by raising the spindle and small disc more or less, gives a similar movement to each cam-shifting plate and therefore to each pair of cams. Of course, the machine may be stopped, and a new chain substituted (even then the new chain would move all cams alike in pairs); but, unless the cams were properly rearranged and reconnected to correspond with the new chain, perfect confusion might be introduced and a crazy-quilt sort of fabric produced. (See what Mr. Snyder said on this point, D. R. pp. 107, 108, A31; and Mr. Thrall, D. R. p. 81.) Defendants' machine may be better or worse than the machine of complainants' patent, but is entirely different so far as this operating mechanism is concerned."

As to the defendants' machine actually made and sold by H. P. Snyder & Co. defending this action, and used by the defendants above named, I think they have substantially all the elements of the patent in suit arranged in the same way to produce the same result. Infringement cannot be avoided by mere changes in form, by making nonessential additions or substitutions, by adding another element or substituting an equivalent for one or more of the elements of the patent, or by changes in mechanical appliances. Nor is infringement

avoided by putting out a machine constructed in accordance with the patent and made to do its work by leaving off some part of the mechanism easily added when it is evident the intention is to have it do the work of the patent, and it is actually used to do that work.

The pattern chains of these machines, whether there be a multiple of chains or one single continuous chain, as I understand, must be provided with links of different heights. I cannot see that it makes any difference, so far as infringement is concerned, or any substantial difference in the operation of the machines, whether the three links of different heights are suitably and properly placed in a single chain, or several chains are used; each having the appropriate or necessary links. This is matter of choice, perhaps of convenience, and it may be of expense in construction; but, so long as the same substantial elements are used, the combination and modes of operation are the same, and the same result is sought and obtained, there is infringement. High links produce a plain stitch, low links produce the welt stitch, and the intermediate links produce the tuck stitch. These chains or a chain are not the subject-matter of this patent. The "soul," as it is expressed many times, of the patent, the "meat in the cocoanut," is found elsewhere. While there must be operative means to project or retract the throat-cams which comprise a pattern device and connections therefrom to each throat-cam, these may be varied, as the patent is not limited in this respect to any particular form. An examination of the machines and devices in actual operation and in parts, so far as material, leads me to the conclusion that infringement is made out.

There will be a decree for the complainant, accordingly, and for an accounting, with costs.