UNITED SHOE MACHINERY CO. v. FARMINGTON SHOE MFG. CO. et al.

(District Court, D. Maine.   July 1, 1916.)

No. 732.

PATENTS ☞328—VALIDITY AND INFRINGEMENT—MACHINE FOR NAILING SHOE SOLES.

The Casgrain patent, No. 864,951, for a machine for nailing the soles and heels of shoes, the essential feature of which is mechanism by which a single depression of the treadle first positively raises the horn on which the shoe is fixed for nailing into operative position, and then starts the machine, and on the release of the treadle the machine is automatically stopped and the horn lowered, was not anticipated, and is valid, as disclosing a new, useful and meritorious invention; also *held* infringed.

In Equity. Suit by the United Shoe Machinery Company against the Farmington Shoe Manufacturing Company and the Champion Shoe Machinery Company. On final hearing. Decree for complainant.

Fish, Richardson, Herrick & Neave, of Boston, Mass., for complainant.

John H. Bruninga, of St. Louis, Mo., and Bradley & Linnell, of Portland, Me., for defendants.

HALE, District Judge. This suit in equity is brought by the United Shoe Machinery Company, assignee of Louis A. Casgrain, patentee, on United States patent No. 864,951, granted September 3, 1907, against the Champion Shoe Machinery Company, alleged to be the manufacturer of certain infringing machines, and against the Farmington Shoe Manufacturing Company, alleged to be using the infringing machines in this district. The invention of the patent in suit relates to a nailing machine for nailing soles and heels on boots and shoes. The complainant alleges infringement of claim 4 of the patent.

The defendants say that the claim in suit is invalid in view of the prior art, and that it is not infringed by either of the machines of the defendants.

In reference to the subject-matter of the patent in suit, it may generally be said that, in such a machine, a series of nails is driven rapidly along the edge of the sole or heel, as one continuous operation; the shoe being fed automatically between the successive nail-driving operations. The shoe is supported, bottom side up, on a horn, which, as soon as the machine starts and while it is running, must firmly hold the work, pressed upwardly, or clamped against an abutment upon the head of the machine, so that the work will resist the downward thrusts of the awl and nail driver. The horn thus is held up against the work by the medium of a heavy spring, known as the horn spring; this spring must be of sufficient strength to resist the thrusts of the awl and nail driver while it affords the necessary yield of the horn at

certain other stages of the operation of the machine. As soon as the machine is started in operation, the awl descends and punctures the work, and then the awl moves horizontally and feeds the work along; after this, the awl is withdrawn from the work, and thereafter is moved back horizontally to its original position. After the awl has been withdrawn from the work, the driver drives a nail into the hole which the awl has left; the awl then descends again, makes a new hole, feeds the work along again, and so proceeds. Just before and during each feed movement, the horn is automatically depressed ·to a slight extent, against the tension of the horn spring, in order to relieve the clamping pressure on the work and permit it to be fed; after this the horn is again raised by its horn spring to clamp and support the work. When the machine is at rest the horn is supported in a position well below the head of the machine, so that a shoe can readily be placed on the horn by the operator, or the shoe, previously operated on, may be removed.

In describing the work of the machine, the learned counsel for the complainant explains that when the machine is started, and before the awl makes its first stroke, the horn must be fully raised, and put completely under the influence of the horn spring, so as to hold the work solidly in position by the full force of the horn spring. The quicker these two operations of raising the horn and starting the machine can be made to follow each other, while insuring their proper sequence, so that the horn will be completely raised with the full clamping pressure before the awl makes its first descent, the more rapidly can the operator turn out work on the machine; and if these two consecutive operations can be successfully brought about, by a single continuous movement of the operator, such as the depression of the treadle by the operator's foot, it is evident that great economy of time and effort on the part of the operator will be effected. Not only is this so in starting the machine, but also in stopping it. The operator, by removing his foot from the treadle, causes the machine to come to a stop and the horn to drop; and these two operations are practically simultaneous, but with sufficient interval between to insure that the last fastener shall be fully driven before the horn is lowered. It is explained, further, that such a single treadle mechanism for starting and stopping the machine, and for controlling the movements of the horn at these times, must, of course, be properly correlated and combined with the power-driven mechanism for periodically depressing the horn, during the feed movement.

It is urged by the complainant that the Casgrain patent in suit describes such a single treadle mechanism, combined with such power-driven, horn-depressing mechanism; the single treadle mechanism having certain positive connections which insure these results. Claim 4, the only claim involved in this litigation, is as follows:

"4. In a machine for inserting fastenings, a horn or work support, a main driving shaft, mechanism controlled thereby to depress the horn periodically, a clutch for the said shaft, controlling means to throw said clutch into or out of operation, a treadle, operating connections between it and said means, to

start the machine, and positive connections between the treadle and horn, to raise the latter manually when the machine is started."

In reference to the word "manually," the specification points out that:

"The term 'manually operated' is intended to mean operated or controlled by the workman or operator."

It is alleged by complainant that the claim presents the alleged single treadle mechanism, and achieves the result of positive connections, which other machines had failed to reach. It is urged that the Casgrain invention consists in simple and effective means whereby the horn is firmly held in raised or clamping position during the operation of the machine, is automatically lowered when the nailing ceases (that is, when the operator stops the machine by removing his foot from the starting treadle), and is automatically put in this position again when the machine is set in motion to resume the nailing; that is, when the operator depresses the treadle to start the machine.

In his specification, the inventor points out that the invention relates to mechanism for controlling the position of the horn, and for effecting its movements, and proceeds:

"While a fastening is being driven into the work, the latter is firmly held or clamped between the horn and a co-operating presser, and I have provided herein simple and effective means for so controlling the horn that it will be automatically moved away or lowered from the presser, when nailing ceases, and maintained in such lowered position until the apparatus is set in motion to resume nailing. Such separation of the horn and presser permits the instant removal of the work from, or application of the work to, the horn with entire freedom."

The machine is a somewhat complicated one. So far, however, as relates to the issues in this case, the features of primary interest are the means controlled by the single treadle for starting the machine and for positively raising the horn, and the power-driven means for periodically depressing the horn during the feed movement.

The treadle in question has, rigidly connected with it, an upwardly extended arm; pivoted to the upper end of this arm is one end of a link, whose other end is pivotally connected to a pivot connecting the ends of two toggle-forming links.

The learned counsel for the complainant explains at length the details of the device, and, in reference to the positive or unyielding feature, says:

"While the Casgrain connections for straightening the toggle, and thus raising the horn to its final work-clamping position, under the full influence of the horn spring, are entirely positive and unyielding, so that this operation cannot fail to take place, no matter how thick the work may be, the necessary capacity for yielding of the horn, due to the horn spring itself, is always present for and utilized to a greater or less extent in the means for raising and supporting the horn. In short, the horn spring yields during the horn-raising operation, when the horn can go no higher."

We may better understand the important features of the patent in suit, if we refer to Figure 3:

Upon this subject it is pointed out in the specification that the depression of the end of the treadle acts "to positively straighten out or set the toggle, and thereby elevate the horn"; and the complainant urges that the "setting of the toggle before the machine is actually started" is the essential thing the patentee was seeking to do, and is precisely what he did. It is not necessary to discuss all the intricacies of this complex machine. We must, however, refer to what is called the "lost motion" result. Leading to this subject the complainant's counsel calls attention to these features: The rear end of the treadle carries a stud operating in the slot, connected to a rod which connects with the controlling means of the clutch for starting and stopping the machine. The stud and slotted foot form a lost motion connection

between the treadle and the clutch, so that, upon depression of the left-hand end of the treadle, the stud on the right-hand end of the treadle rises idly in the slot, without having any effect to raise the rod and start the machine, until the treadle has been depressed sufficiently to insure full straightening of the toggle and putting the horn fully under the influence of the horn spring, before the awl makes its first stroke. Just at the end of the depression of the treadle, the stud strikes the top of the slot, raises the rod, and starts the machine. The specification points out:

"The horn is therefore always moved into operative position in advance of the starting of the machine, so that there is no danger of a fastening being driven before the work is in position to receive it."

The treadle is acted upon by the flat spring, which, as the treadle is depressed, is put under strong tension and will return the treadle to its normal inoperative position as soon as the operator removes his foot from the forward end of the treadle. When the treadle is thus moved to inoperative position, as soon as its rear end begins to descend, it permits the rod to be forced downwardly by its spring, thereby disconnecting the clutch, and stopping the machine; and this is immediately followed by the complete breaking of the toggle and the lowering of the horn.

The counsel for the complainant then enters upon a full description of the details of operation, which I do not think it necessary to repeat. He urges that the vital thing to which attention should be called in this litigation is the attempt of the patentee in claim 4 to fully straighten the toggle before starting the machine, so that the awl will have something firm to strike against.

In order to show precisely how the straightening of the toggle was effected by the patentee of the patent in suit, it is well to refer at once to the prior art. The main reference in the prior art is the Cutter patent, No. 582,579, dated May 11, 1897, disclosing a device for inserting nails in the soles and heels of boots and shoes. Both parties lay great stress upon this patent. The defendant says that claim 4 distinguishes from the construction which the defendants present in the same way that this claim distinguishes from Cutter, and that the defendants do not infringe claim 4. It is urged by the complainant that Cutter was aiming to produce the same results which Casgrain later did produce, namely, raising and lowering of the horn and starting and stopping the machine in proper sequence, by a movement of a single treadle in a nailing machine of the general type now before us. It is urged that Cutter failed, because he provided his machine with lost motion and yielding connections between the treadle and the horn-raising toggle, in order to insure the starting of the machine after securing the necessary delay relatively to the horn raising, while Casgrain met with success because he located his lost motion connection between the treadle and the clutch controlling mechanism, and provided positive connection from the treadle to the horn-raising toggle, so that the toggle would always be fully straightened and the horn fully raised, and put under the influence of the horn spring before the first stroke of the awl upon starting the machine, no matter how thick the work to be operated on. And the complainant urges that the "sole

question in the case is whether defendants have the positive toggle-straightening connections of Casgrain, or whether they have the lost motion and yielding connections of Cutter between treadle and toggle."

In order to present clearly the features of the Cutter patent involved in this suit, we refer to Figure 1 of that patent. Cutter's object is stated to be:

"To produce a more practicable, smoother operating, and a more reliable machine than others now in common use."

Claim 16 is as follows:

"A vertically movable stock support, toggles to raise and lower said support, a starting and stopping treadle mechanism operated thereby to start or stop the machine, a yielding connection between the treadle and the toggles, whereby the stock support is automatically raised when the treadle is operated to start the machine and automatically lowered when the treadle is operated to stop the machine; said yielding connection allowing the treadle to be further operated provided the stock support is raised as far as possible before the treadle has caused the starting of the machine, for the purpose set forth."

The purpose and working of this patent can be seen more clearly by having Figure 1 before us.

In reference to the features disclosed in this figure, the specification points out:

"To allow the starting treadle to be fully depressed in case the stock support is raised as far as possible prior to the withdrawal of the wedge *46* from under the dog *37* and the consequent starting of the machine, I provide the link *58* with a slot, through which one of the pins pass which connect said link to the toggles or to the projection on the starting lever and insert a spring *59* within said slot, as shown in Fig. 1, so that said spring will yield and allow the treadle to be further depressed, if necessary. This yielding in the connection between the starting treadle and the toggles may be accomplished by any other and equivalent means than by the use of the spring *59* without departing from my invention.

"The yielding connection between the starting and stopping treadle and the device to raise and lower the stock support is necessary, or especially desirable, when stock of greater thickness than that just nailed is to be nailed, as the support will be raised as far as possible before the wedge is withdrawn from the dog and the machine started. If this yielding connection were dispensed with, it would be necessary in such a case to depress the treadle with sufficient force to overcome the influence of the spring *23* and to force the rod *22* upward until the wedge *46* was freed from the dog *37*, which operation would require a great pressure on the treadle.

"By the use of the connection between the starting lever and the device to raise and lower the support for the stock it will be seen that said support is automatically raised into operative position by the starting of the machine, and automatically lowered so as to remove the stock therefrom or to replace it when desired by the stopping of the machine."

It is urged by the complainant that the Casgrain machine of the patent in suit improves upon the Cutter machine by providing positive connection from the treadle to the toggle, insuring that the toggle shall be fully straightened and the horn positively raised and put under the influence of the horn spring, before the machine makes its first stroke, entirely irrespective of the thickness of the work, the proper sequence being obtained by actuating the clutch just as the straightening of the toggle is being completed; this will insure full straightening of the toggle before the machine makes its first stroke. Mr. Calver, the defendant's expert, says:

"The real difference between the two machines is that the lost motion which, in the Cutter machine, is between the treadle and the toggle, is, in the Casgrain machine, between the treadle and the clutch-operating rod."

The desirability that the toggle should be straightened before the machine is started is admitted on all hands; and it is contended by the complainant that this is achieved by Casgrain over Cutter. The two machines were brought in conflict at the Patent Office. Casgrain's claim was first rejected on the Cutter patent; then the claimant insisted upon his claim; the force of his argument may be seen by examining the figure of Cutter's patent, to which reference has been made. The applicant in the Patent Office said:

"In Cutter, when the lever *42* is depressed into the position shown in Fig. 1, the arm *57* will push to the left the link *58* to set the toggle levers *16*, *17*; but the joint connecting the toggles *16*, *17*, enters a slot in the link *58*, and a spring *59* is interposed between the right-hand end of the slot and the pivot, so that the action of the treadle to set the toggle is not positive, but is more or less yielding, and must be so at all times. A positive connection such as shown by applicant is not and cannot be construed to be the same as a spring connection in Cutter, and we have to ask that these claims be reconsidered with this point in view, and it is submitted the claims should be allowed."

After a hearing, the Patent Office allowed the Casgrain claim. It will be noted that Casgrain calls for a connection from the treadle to the toggle, which "will set the toggle, there being no lost motion, play or yielding action whatever in the operation." This is clearly distinguished from the spring *59* of Cutter, which forms a yielding connection between the treadle and the toggle, "whereby the action of the treadle to set the toggle is not positive, but is a more or less yielding one, and must be so at all times."

Without going further into details, I am forced to the conclusion that claim 4 of the patent presents a distinct and meritorious invention, and is not anticipated by Cutter.

Weeks & Tuttle's patent is cited in the prior art. It is No. 566,359, dated August 25, 1896. In this patent the inventor shows three distinct and separately operated treadles—one for raising the horn before starting the machine, another for starting the machine after the horn has been raised, and for stopping the machine before the horn

has been lowered, and a third for lowering the horn after the machine has been stopped.

It is clear that the Weeks & Tuttle patent shows three separately operated treadles. In the specification it is said:

"The horn being depressed by the breaking of the toggle *p*, the work is placed upon it and then lifted by restoring the toggle to a vertical position, it being understood, of course, that the horn has first been adjusted to the thickness of the work to be nailed."

Clearly this patent discloses three treadles; and I find nothing in the specification, or in the figures, tending to the conclusion that any two of the treadles are operated as one. The complainant in the patent in suit points out the advantage of the single treadle over the three treadles:

"The great practical advantage of raising the horn and starting the machine by a single treadle or equivalent device, operated by a single continuous depression of the operator's foot, and of stopping the machine and dropping the horn by simply releasing the one treadle or equivalent device, as compared with separately actuated treadles for these different operations, as in Weeks and Tuttle, will be more fully appreciated, when it is realized at what speed a machine embodying the Casgrain construction can be and is operated in practice."

In the Casgrain machine the horn is raised by a single treadle operated by the single depression of the operator's foot, and is stopped by releasing the single treadle. It is unnecessary, at this point, to refer to the bearing of the Weeks & Tuttle patent upon the question of the defendant's infringement. On the question of anticipation, it is clear that nothing is disclosed in the Weeks & Tuttle patent which should be held to avoid the Casgrain patent by reason of anticipation.

The Goddu patent in the nailing machine art, No. 310,816, is referred to, but, I think, requires no comment.

After examining the patents that have been brought before me in the prior art, I am constrained to find that claim 4 in the patent in suit is not rendered invalid by reason of anticipation. I think the improvement brought before me in claim 4 shows something more than a mere mechanical advance in the art, and must be held to be an invention of merit. The improvement which the inventor made in this claim over anything in the prior art seems to have worked a beneficial result and to be entitled to recognition as the result of an exercise of the creative faculty. The whole case shows, I think, that the patentee in this claim took the step which turned failure into success. Under the well-known principles of the patent law he should have the benefit of his inventive thought. Barbed Wire Case, 143 U. S. 275, 12 Sup. Ct. 443, 36 L. Ed. 154; Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 Sup. Ct. 652, 53 L. Ed. 1034.

### Infringement.

The defendants say that their machines do not infringe claim 4, because they do not have the positive connections specified in the claim for raising the horn, but that they have yielding connections for this purpose.

The defendants bring two machines before the court. Their main construction is shown in the drawing produced at the trial, offered on page 5 of the complainant's record, and shown at page 59:

Defendants' Construction

In this drawing is the horn (*1*); above it is the fixed abutment upon the head of the machine, against which the work is pressed by the horn when raised in position. The awl and driver make their downward strokes through this abutment, as in the Casgrain device, the

awl feeding the work and the driver driving the nail in the awl hole after the awl has been withdrawn. Below is shown the treadle at *14*, pivoted at *15* to the base of the machine, and positively connected at *13* with one arm of the bell-crank lever *10*, fulcrumed at the base at *11*. The other arm of the bell-crank lever *10* is pivoted at *9* to the link *8*; this arm and this link together form a toggle for raising the horn; this toggle is positively connected to the treadle and is positively straightened to raise the horn fully and put it under engagement with the horn spring whenever the treadle is depressed. The upper end of the toggle link *8* is pivotally connected at *7* to a movable sleeve *4*, upon which rests the horn spring *5*. Through this sleeve, the horn spindle *2* projects; and this spindle carries the horn. The horn spring *5*, at its upper end, abuts against a collar *3*, on the horn spindle *2*. When the treadle *14* is depressed, and the toggle positively straightened, sleeve *4* is raised; this raises the horn spring, the horn spindle, and the horn, until the horn and its spindle are stopped by the work coming in contact with the presser or abutment; then the continued straightening of the toggle and raising of the sleeve *4* will compress the horn spring, thus putting the horn under the influence of this spring, and applying to the work the firm clamping pressure of the horn spring. It is pointed out that if the work be thick the horn spring, in straightening the toggle, will yield more than if the work be thin. The contention of the defendants is that this machine does not have positive connections between the treadle and the horn within the meaning of claim *4*. They contend that their horn spring takes part in the raising of the horn and yields more or less at the end of the operation. On examination of the two devices it seems to me to be clear that the defendant's machine has positive connections for straightening the toggle and putting the horn under the influence of the horn spring; that it shows the important function which Casgrain shows, of making a firm support upon which the work may be done, by substantially the same means employed by Casgrain. Where Casgrain has improved upon Cutter, eliminating the yielding device of Cutter, the defendant has followed Casgrain. As we have seen, Casgrain puts his lost motion connection between the treadle and the clutch-controlling rod, and provides positive connections from his treadle to his toggle; thereby, he produces a firm support, made by a fully straightened toggle and a horn spring raised positively. In this respect, the defendants have clearly followed Casgrain, and have not followed Cutter.

With reference to the defendants' contention that their horn spring takes part in the raising of the horn and presents a yielding action at the end of the operation, I think it must be said that the horn spring plays the same yielding part with the raising of the horn, in Casgrain's machine, that it plays in the defendants' machine; so that, if this yielding element in the horn spring negatives the presence of positive connections of Casgrain's claim 4 in the defendants' machine, it does the same thing in the Casgrain machine.

In Casgrain's machine the lower link of the horn-raising toggle pushes against the horn spring; and in the defendants' machine the

upper link of the toggle pushes against the horn spring. The purpose and result seem identical in the two cases. The complainant's expert gives clear testimony upon this subject:

"The spring 5 in the defendants' machine and the spring *S'* in the Casgrain machine are practically identical in function, and have no more to do with the operation of the parts which raise the horn in one case than in the other. For this reason I, accordingly, have no hesitation in stating it as my opinion that the last element of claim 4 of the patent in suit, reads upon and applies to the construction exhibited by the defendants' machine, as fully as it reads upon and applies to that of the Casgrain patent in suit."

The learned counsel for defendants has illustrated his contention by the use of models in his interesting argument and able presentation of the case. After a careful study of the two mechanisms brought before me, I am forced to the conclusion that the main construction of the defendants' machine shows all the features of claim 4 of the patent in suit, and is an infringement upon that claim. I think the record in the Patent Office, as shown in the file wrapper, tends also to this conclusion.

The defendants bring before the court a modified machine. A drawing of this machine is offered in evidence and appears in the record:

Defendants' Modified Construction.

This machine is like their main construction, except that the treadle *14* in the modified construction is split into two parts, one of which raises the horn; the other starts the machine.

The defendants contend that, in this modified construction, they are following the Weeks & Tuttle machine, and are not infringing the Casgrain patent. Defendants say that the two Weeks & Tuttle treadles for raising the horn and starting the machine are adapted and intended to be operated as a single treadle by a single depression movement of the operator's foot, and that the Weeks & Tuttle machine is essentially the same as the defendants' modified machine. Upon examination of the two machines, I cannot sustain this contention. The Weeks & Tuttle specification does not support the idea of "simultaneous depression," of the horn-raising and machine-starting treadles, as I have already shown. It cannot, I think, be said that in Weeks & Tuttle there are two treadles placed near together, so that they may be operated and are intended to be operated by a single downward movment of the foot of the attendant. I think it cannot fairly be said that, in the Weeks & Tuttle machine, we have a two-part treadle, as we clearly have in the defendants' modified machine.

The splitting of the treadle into two parts does not affect its use as a single treadle, and does not prevent infringement. The proofs and the drawing show that the two treadle parts in the machine present in effect a single treadle surface, and that the operator, in fact, operated them the same as he would have operated a single piece treadle; that he engaged both parts of the treadle with his foot in a single depressing movement, in the same way that he would depress the one-part treadle of the defendants' main construction. In other words, there was clearly "simultaneous depression" of the two parts of the treadle in the defendants' machine, and that such "simultaneous depression" did not exist in the Weeks & Tuttle device. Without dwelling on the details of proof, brought before me, I am constrained to find that the defendants' modified construction cannot be sustained as following the Weeks & Tuttle patent, but that it does clearly follow claim 4 of the patent in suit, and is an infringement of such claim. I think it is as clear an infringement as is the machine of the defendants', first brought before us.

My conclusion, then, is that claim 4 of the Casgrain patent is not invalidated by the prior art, but is a valid claim; that it presents a new, useful, and meritorious invention; that the defendants have infringed this claim, both by their main construction and also by their modified construction.

A decree may be entered for an injunction and an accounting as to both constructions of the defendants. The complainant recovers costs.

The complainant may present a draft decree, on or before July 17, 1916. The defendants may present corrections, if any, on or before July 31, 1916. The decree is to be settled August 7, 1916, at 10 o'clock a. m.