CHAMPION SHOE MACHINERY CO. v. UNITED SHOE MACHINERY CO.

(Circuit Court of Appeals, First Circuit. June 16, 1917.)

No. 1245.

PATENTS ☞328—INVENTION—MACHINE FOR NAILING SHOE SOLES.

The Casgrain patent, No. 861,951, for a machine for nailing shoe soles, claim 4, held invalid for lack of patentable novelty, in view of the prior art, and especially of the Cutter patent, No. 582,579.

Appeal from the District Court of the United States for the District of Maine; Clarence Hale, Judge.

Suit in equity by the United Shoe Machinery Company against the Champion Shoe Machinery Company and another. Decree for complainant, and defendant named appeals. Reversed.

For opinion below, see 235 Fed. 139.

John H. Bruninga, of St. Louis, Mo., for appellant.

Alexander D. Salinger and Frederick P. Fish, both of Boston, Mass., for appellee.

Before DODGE and BINGHAM, Circuit Judges, and ALDRICH, District Judge.

DODGE, Circuit Judge. The District Court has held claim 4 of United States patent 864,951, issued September 3, 1907, to Louis A. Casgrain, upon an application filed August 4, 1898, and now owned by the appellee, valid and infringed by both the corporations, who were defendants below. One of them had bought and used the machines held to infringe; the other had made and sold said machines. The defendant last referred to is the only appellant before us.

In the opinion of the District Court (United Shoe Machinery Co. v. Farmington Shoe Mfg. Co., 235 Fed. 139) the important features of the patent, of the machines held to infringe, and of the earlier patents relied on by said defendant, are so clearly and fully set forth as to render much description in detail of the construction and mode of operation of the various mechanisms there referred to unnecessary in this opinion.

The contention that the claim in suit is invalid in view of the prior art is first to be considered. The claim is for the combination, in a machine for inserting fastenings, of the following old elements:

(1) A horn or work support.
(2) A main driving shaft.
(3) Mechanism controlled by said shaft to depress the horn periodically.
(4) A clutch for said shaft.
(5) Controlling means to throw said clutch into operation.
(6) A treadle.
(7) Operating connections between said treadle and said means to start the machine.
(8) Positive connections between the treadle and horn, to raise the latter manually (i. e., operated or controlled by the workman or operator) when the machine is started.

The appellant says that all the elements of the above combination, operating in substantially the same manner, are found in two prior United States patents, both of them expired: One, No. 566,359, August 25, 1896, to Weeks & Tuttle, for a sole-nailing machine; the other, No. 582,579, May 11, 1897, to Solomon M. Cutter. Many other prior patents were referred to in the answer, but it is upon these two that the appellant mainly relies. The questions to be determined involve more especially the elements above identified as (4) to (8) inclusive.

As to the Weeks & Tuttle patent, the machine it describes has three treadles, side by side and separately operated. By depressing one of them the clutch is thrown into operation and the machine thereby started, which continues to run while this treadle is kept depressed, which treadle has no connections operating either to raise or to lower the horn or work support. By the depression of another treadle alongside the first, the horn is raised into working position before the machine starts; when so raised, it is locked in working position, and the same treadle cannot be operated to lower it. By depressing a third treadle, after the machine has been thrown out of operation by release of the second treadle, the horn is unlocked and lowered from its working position. Although the second treadle may be said to have "positive connections" between it and the horn, we agree with the District Court in being unable to regard the mechanism which this patent de-

scribes as an anticipation of the patent in suit, wherein depression of the single treadle used first starts the machine, and, after that has been done, raises the horn to working position, wherein it is kept until stopping of the machine, which is permitted by release of the same treadle, lowers the horn automatically. We do not find described by Weeks & Tuttle either the same combination or the same mode of operation as that described in the patent and covered by the claim in suit. Nor can we hold that a combination wherein the same depression and release of a single treadle was made to do what had before required the operation of three independent treadles added nothing patentably new to the art.

Such an addition to the art, however, had been made before the filing of Casgrain's application by the later Cutter patent, with regard to which a much more serious question is presented. This patent describes mechanism like that of the patent in suit, in that by the depression of a single treadle the horn is first raised and the machine thereafter started. Once so started, the machine continues to run until the treadle is released; its release permits automatic stoppage of the machine, and from such stoppage lowering of the horn automatically results. The difference here important between Cutter's mechanism and that of the Casgrain patent in suit lies in the fact that Cutter's "connections between the treadle and the horn, to raise the latter manually when the machine is operated" are not "positive," like those of the patent, but yielding, as more fully explained below. The Cutter mechanism includes another treadle, also having connection with the horn; but its functions need not be considered for the purposes of this case.

The connections between Casgrain's treadle and horn, whereby depression of the former is made to raise the latter, include a toggle, which lifts or lowers the horn as it is straightened or yields, and this is true, also, of the mechanism described in both the above prior patents. But in the patented mechanism that depression of the treadle which ultimately throws in a clutch, and thereby starts the machine, must first have completely straightened the toggle, and by so doing have raised the horn into its desired operative position, wherein it is supported by the straightened toggle, and cannot yield downwardly, except as permitted by the horn spring, whose upward pressure holds the horn when in said operative position, with the work supported thereon, against the piercing and nailing mechanism, while the machine is being operated. The horn spring is relied on to accommodate itself to any differences in thickness of the work so supported; and the toggle is necessarily straightened as above, before the machine starts, without regard to any such differences in thickness, because the connections whereby depression of the treadle tends to straighten the toggle admit of no yielding, whatever resistance may be encountered to such straightening. A yoke attached to or forming part of the treadle has rigidly secured to it an upturned arm, pivoted to the toggle joint by a rigid link, so that, in the language of the specification, "depression of the end of the treadle * * * will act through the upturned arm * * * and link * * * to positively straighten or set the toggle

and thereby elevate the horn," etc.—the toggle being thus fully straightened and set before the treadle can be so far depressed as to move the controlling means whereby the clutch is thrown into operation and the machine started.

In Cutter's earlier mechanism the treadle also operates through a link to straighten a toggle, whose straightening lifts the horn. But Cutter, as his specification distinctly states, does not propose that the toggle shall necessarily be fully straightened before the treadle is so far depressed as to start the machine; he intends that in case "stock of greater thickness than that just nailed" is on the horn for nailing, the horn shall be raised before the machine starts, only "as far as possible." He points out that, in such a case, positive connections would require the exertion of force enough in depressing the treadle to overcome the influence of the horn spring, in order to fully straighten the toggle before the point of depression could be reached at which the treadle operates to start the machine; and he therefore provides a "yielding connection," whereby, after raising the horn as far as permitted by the thickness of the stock supported on it, depression of the treadle is continued, without having first to overcome any resistance of the horn spring, until it has operated the starting mechanism. Cutter's toggle is left, in such a case, not quite straightened or set when the started machine first brings the awl down into the stock; but it remains under the tension of the spring which makes the treadle connection "yielding," whereby it will be straightened or set as soon as the feeding mechanism after the first descent of the awl, so relieves the opposed tension of the horn spring as to let the stock and awl move toward the driver.

It is undisputed, as was said in the opinion below, that complete straightening of the toggle before the machine is started is desirable in machines of this kind. Cutter's mechanism secured this advantage whenever the stock at the time supported on the horn was not thick enough to require any compression of the horn spring in order to straighten the toggle. Casgrain's mechanism secured it in all cases, without regard to any differences in thickness of the stock, compressing the horn spring, if necessary. The appellant contends that, although Cutter's mechanism provides a treadle connection which is to yield as above when extra thick stock is being supported, in order to avoid the necessity of extra force on the treadle, his patent nevertheless in effect discloses and his claims cover a structure comprehending positive as well as yielding connections, and so capable of securing the above advantage whatever the thickness of the stock on the horn. One of Cutter's claims (No. 15) calls only for "a connection between the treadle and the toggles whereby said stock support is automatically raised when the treadle is operated to start the machine and automatically lowered when the treadle is operated to stop the machine," etc. But nowhere in his patent is any structure having other than yielding connections described or shown, although two forms of yielding connections are described and shown.

Although it is true also, as the file wrapper shows, that, in the Patent Office, Casgrain's application was at first rejected in view of Cutter's patent, and finally issued because of the argument that the positive con-

nection shown by Casgrain could not be construed to be the same as the yielding connection of Cutter; and although it may well be true that Casgrain improved upon Cutter from a practical point of view by making the connection positive instead of yielding, we are unable to regard the improvement so made as one involving invention upon Casgrain's part. We are of the opinion that, so far as any invention was involved in either combination, the advantage of making depression of the single treadle first wholly straighten the toggle, and start the machine after but not until this was accomplished, was really secured by Cutter, leaving nothing to be done beyond mechanical adaptation in order to change Cutter's yielding connection into a positive connection or to substitute the latter for the former.

Casgrain provides no way of avoiding that necessity for extra pressure on the treadle which Cutter distinctly pointed out as involved in the use of a positive treadle connection whenever thicker stock happens to be on the horn; he simply accepts the necessity and rejects Cutter's way of avoiding it. The commercial success shown to have been attained by Casgrain's machines as marketed by the defendant tends to show that in practice such necessity has not proved to be a serious disadvantage. But we fail to see how, in so accepting it, Casgrain really did anything which Cutter had not shown him how to do. We are therefore unable to agree with the District Court in its conclusion that the mechanism covered by the claims in suit was the result of an exercise of the creative faculty amounting to inventive thought.

It may be here mentioned that Cutter's mechanism, as described in his patent, includes also means for adjusting the position of the horn by hand according to the thickness of the stock to be operated on, the due use whereof would result in the full straightening and setting of his toggle at the proper point of depression of the treadle in all cases, its connection with the horn then operating no differently than if it were positive and without capacity for yielding. But in most cases no resort to his hand adjustment was needed, as above shown, to make his treadle connection operate as if it were unyielding so far as straightening and setting the toggle is concerned. When not required to yield, it was to all intents and purposes a positive connection.

It is true there is no proof that machines made according to Cutter's patent have been practically used; but it is also true that there is no proof that such machines would be incapable of successful practical operation, and we see no reason for supposing that they would be so incapable. The most that is claimed in this direction is that, whenever the toggle was not fully straightened or set, the first nail thereafter driven by the started machine might fail to be properly driven; and this is the full extent of the advantage secured by the only deviation made by Casgrain from the combination described by Cutter, which has any importance for the purposes of this case. It does not seem to us that this amounts to patentable novelty in function or mode of operation. We must therefore hold the claim invalid for want of such patentable novelty, in view of the prior art.

The above conclusion renders it unnecessary to consider the ques-

tions of infringement raised, validity of the claim being assumed, as to either form of machine made and sold by the appellant.

The decree of the District Court is reversed, and the case remanded to that court, with directions to dismiss the bill; and the appellant recovers its costs of appeal.