### BABCOCK & WILCOX CO. v. NORTH CAROLINA PULP CO.

No. 1266.

District Court, D. Delaware.

Oct. 21, 1940.

George F. Scull and William F. Wilder, (of Gifford, Scull & Burgess), and Joseph P. Moran, all of New York City, and Herbert L. Cohen, of Wilmington, Del., for plaintiff.

Zachary T. Wobensmith, 2nd, and James C. Wobensmith, both of Philadelphia, Pa., and Charles F. Richards (of Richards, Layton & Finger), of Wilmington, Del., for defendant.

NIELDS, District Judge.

This is a patent infringement suit. The Babcock & Wilcox Company, plaintiff, charges North Carolina Pulp Company, defendant, with infringement of Wagner patents No. 1,771,829 for "Apparatus for the Recovery of Chemicals and Heat from Waste Liquors", and No. 2,050,400 for "Method for Recovery of Heat and Chemicals from Waste Products". The defenses are invalidity and non-infringement.

Plaintiff is a New Jersey corporation engaged in building large steam boilers and furnaces. It is the owner of the Wagner patents in suit. Defendant is a Delaware corporation having a paper pulp mill in Plymouth, North Carolina, where the alleged infringing apparatus and method are in use. The suit is defended by Day & Zimmerman, Inc., engineers who designed and built the recovery furnace now operated in defendant's pulp mill.

## The Art

The Wagner patents in suit are respectively for an apparatus and for a method for recovering the chemicals and the heat values from waste liquors. The inventions have been used for the treatment of "black liquor" in the paper pulp industry and defendant's accused apparatus and method are used for that purpose.

The "black liquor" of the paper pulp industry is the residual liquor coming from the digesters in which wood in the form of chips is "cooked" under heat and pressure in a solution of chemicals. The organic matter binding the cellulose fibres in the wood is dissolved out. After the cooking is completed, the wood pulp is removed from the solution and goes to the pulp treating section of the plant. With this we are not concerned. The "cooking" solution, after the digestion, is "black liquor" with which this opinion is concerned.

Reverting to the production of wood pulp we find two methods of production employed. One method called the "soda" process uses only caustic soda as the solvent. The other, called the "sulphate" process, uses a mixture of caustic soda and sodium sulphide as the solvent. The sulphate process is the process used by defendant.

In either the soda or the sulphate process the black liquor coming from the digesters contains about 10 percent solids. The recovery of the chemicals in these solids is the problem with which plaintiff's patents is concerned. The value of the chemicals used is high. It would amount to approximately 20 percent of the selling price of the pulp if new chemicals had to be used for each batch of pulp. If the sodium and sulphur constituents of the black liquor are recovered and reused in the cooking operation, there is a considerable saving in the cost of pulp manufacture.

Furthermore, the organic matter in the black liquor is combustible. In recovering the chemical values from the black liquor, these combustibles can be burned without interfering with the recovery of the chemicals. Thus heat values become available for generating steam and add to the saving. However, the recovery of the chemicals is the important thing.

## Prior Art

Recovery of chemicals was an old idea. It had been appreciated for forty years that it was wasteful to throw away black liquor. Before 1925, when Wagner filed

his application, the art used a so-called "rotary". In the rotary system there was an iron cylinder open at both ends and mounted so it could be rotated. At one end there was a coal furnace and at the other end a chimney. The black liquor was concentrated to 50 percent of solid matter and pumped into the cylinder of the furnace and the cylinder rotated. The gas went out the chimney and a black char, like a film, was formed on the inside of the cylinder by the rotary motion.

In the prior art, the only departure from the rotary system was Moore. He sprayed his liquor through nozzles into a horizontal furnace. U. S. Patent No. 1,137,780 covers Moore's first method and apparatus. By his own admission he was unable to provide a continuous process unless he used extraneous heat. In his 1917 paper he described his first method and apparatus as follows: "I showed that, while it was theoretically possible to evaporate the 50 percent liquor to dryness, ignite and burn it without the addition of extraneous fuel, it was not practical at that time because no method had been evolved by which the liquor could be subdivided to that minuteness necessary for this operation to take place. * * * It was also brought out that, without extraneous sources of heat, this liquor was not evaporated and ignited, but that it landed on the fire, plastering it over and putting it out. It was also brought out that it was not lack of sufficient heat in the furnace, but that there was no means of transmitting the required heat to the flying particles at such a rate as to evaporate the water and ignite the remainder while in transit."

Moore's patent No. 1,326,414 covers his second method and apparatus. He tried to dispense with extraneous heat by subdividing the black liquor into the finest particles. He resorted to what he called an "explosive force in the liquor". For this purpose he heated the liquor to a high temperature and pressure as it flowed into the furnace so that when it was released in the form of spray each drop would be exploded. Obviously such fine particles were carried out of the furnace by the slightest draft. Moore said he was obliged to use an electrostatic precipitator to recover the chemicals. As a result very little of the chemicals were deposited on the floor of the furnace.

None of the witnesses had ever seen Moore's installations. What is known of them can be ascertained only from Moore's writings. It is significant that Moore's employer, the Brown Corporation, purchased a Wagner furnace in 1930 for its Canadian plant. There were serious objections to both of Moore's systems. In the first, he used an extraneous fuel and in the second, by superheating the liquor he obtained such fine particles that the chemicals were lost. These attempts constitute the practical results of many workers over thirty or forty years and bring us to Wagner.

Wagner adopted two incidents of the prior art: (1) The black liquor was concentrated in form, and (2) he sprayed the liquor into the furnace.

### Wagner

The Wagner system is disclosed in the first Wagner patent No. 1,771,829. A furnace is described and a method which may be carried out in the furnace. Only the furnace is claimed in this patent and only claim 1 is in issue. Claim 1 reads: "1. In an apparatus for treating paper pulp waste products, a vertical retort having an upper zone and a communicating lower zone, inlet devices in said upper zone for introducing waste products therein in finely distributed form, air inlet ports in said upper zone, additional air inlet ports in said lower zone, an outlet in said upper zone for heated waste gases, means for controlling the quantity of air to said ports, and an outlet in said lower zone for the non-gaseous residue."

The second Wagner patent No. 2,050,-400 is in the nature of a division or continuation of the first patent. It describes the same method as is described in patent No. 1,771,829. Claims 3, 5 and 7 are in issue. Claim 3 is typical and reads: "3. A continuous self-sustaining process of treating waste liquor containing combustible organic matter which comprises spraying the liquor into the upper section of a preheated furnace into intimate contact with an ascending stream of high temperature heating gases, the liquor spray being so directed as to cause the liquor to remain in the upper furnace section in heat absorbing relation with the heating gases for an interval sufficient to effect substantially complete dehydration of and at least partial distillation of volatile combustibles in the liquor while in the upper section, supplying primary combustion air to the lower section of the furnace for the burning of the dehydrated residue depositing therein

from the upper section without requiring the addition of auxiliary fuel, directing the heating gases generated in the lower section upwardly through the upper section for dehydrating the liquor being sprayed thereinto, supplying secondary combustion air directly to the upper section for the burning therein of the combustible gases distilled from the liquor while in the upper section and any unconsumed combustibles escaping from the lower section, and withdrawing the heating gases from the upper part of the upper section."

The Wagner system is a continuous one. The black liquor is sprayed into the furnace continuously, the recovered chemicals flow out of the smelt spout continuously, and the hot gases from which the heat may be recovered flow from the furnace continuously. The system is self-sustaining because the only heat used is that derived from the burning of the black liquor. There is no foreign fuel or extraneous source of heat.

Wagner patent No. 1,771,829 is the parent of Wagner patent No. 2,050,400. Wagner has a vertical furnace having a smelt spout at its hearth and gas outlet at the side of its upper portion. He does not mention the enlarged upper part in his specification. Like every furnace man he knew how it would function. There are nozzles in the walls of the furnace by which the black liquor is sprayed downward. Air flows through ports into the lower part of the furnace. In the roof there are other airports. The air is supplied to all the ports by a fan and may be heated by an air heater.

Wagner had two combustion zones, an upper and a lower zone, each with its independent air supply. He did not delimit the zones. In this art it was common practice to have what are called combustion zones. For example in Knibbs' patent No. 1,459,-156 Knibbs discloses a straight vertical retort for cracking mineral oil. The air was supplied from the bottom and the heat utilized for cracking the oil in the upper zone. Knibbs says: "The chamber may in these circumstances be regarded as comprising two zones, in the upper of which distillation and cracking takes place while in the lower the combustion of the residuals is effected". In Knibbs there is no physical demarkation of zones.

The important thing is that there are two vertically contiguous zones in each of which different steps of the method are carried out and to each of which combustion air is directly supplied. In the upper zone, the black liquor from the spray nozzles is dehydrated and some of the volatiles are distilled off. From this upper zone the spray droplets, dehydrated and partially distilled, fall to the hearth in the lower zone where the carbon is burned and the chemicals are smelted so that they run out through the smelt spout. Volatiles distilled in the upper zone mingle with the combustion air of the upper zone and are burned. All of the combustibles in the black liquor are substantially completely burned. The burning which takes place in the lower zone generates hot gases which flow upward toward the gas outlet. In so doing they are flowing countercurrent to the particles falling toward the hearth.

Wagner divides and proportions the air so that only part of it is supplied to the lower zone. The remainder is supplied directly to the upper zone. Knowing the quantity of combustibles present, the amount of air needed for complete combustion can be calculated. Combustion air in an amount necessary to utilize fully the heat values in the black liquor is supplied to the furnace in separate proportional amounts directly to the two combustion zones.

The solid content of the black liquor of the sulphate process is made up of all sorts of organic compounds derived from the woody material cooked in the digester. Some are combined with the sodium of the caustic soda and the sodium and sulphur of the sodium sulphide of the digester liquor. When subjected to the heat of the furnace, these organic compounds break down and release their carbon and volatiles, such as hydrogen. These form the combustibles which are burned in the furnace. At the same time, the sodium and the sulphur are freed from the organic matter and are the chemicals which run out of the smelt spout.

In the sulphate process "salt cake" is fed into the furnace to make up for losses of chemicals. This salt cake is fused in the bed of char on the hearth. The sodium sulphate is reduced to sodium sulphide and flows out of the smelt spout. It is the recovery of the sodium and the reduction of the sulphate which is the primary purpose of the operation. The ideal would be to have all the chemicals smelted on the hearth.

The chemicals carried out of the furnace with the hot gases should be as small as possible. What goes out of the furnace is called the "carry-over". The amount of the carry-over will be decreased if the velocity of the gases is low. Since Wagner supplies less than the total amount of combustion air to the lower part of his furnace, he has decreased the upward velocity of the gas stream and provided a means for decreasing the carry-over. If all of the air entered the bottom of the furnace through the ports of the lower zone there would be more combustion taking place in that zone resulting in a higher temperature. That in turn would increase the volume of the gases and again we would have a greater gas velocity from the lower zone. By restricting the amount of air supplied to the lower zone Wagner has kept down the velocity of the gases. First, as a result of the smaller volume of air which he admits to the lower zone, and second, as a result of decreasing the volume of gases by keeping their temperature down. In this way, he minimizes the amount of carry-over of the chemicals.

Wagner supplies the remainder of the required combustion air directly to the upper zone as secondary air. This secondary air burns the unburned combustibles and improves the conditions for rapid dehydration of the spray. This dehydration is proceeding because of the heat in the rising column of gases into which the particles are sprayed and through which they are falling. By supplying air directly to the upper zone and thus increasing the burning in that zone, more heat is available for dehydrating the spray particles. It should be noted that, in the Wagner system the spray particles are moving counter to the gases. This has an effect on the dehydration. Each particle is held in the upper zone for a longer time and thus the particle is given a longer time to dry before it reaches the hearth.

Wagner's furnace in patent No. 1,771,829 is much larger at the upper part than at the lower part. In the enlargement, the velocity of the gases decreases. Moreover, the upwardly rising gas stream must turn in its flow to pass out through the horizontal outlet. Each of these effects will cause some of the chemical particles to drop on the sloping floor of the enlargement from which they will flow back into the lower part of the furnace and to the hearth.

## Infringement

Defendant's furnace was designed with knowledge that recovery of chemicals was the primary object. Defendant suggests that its furnace was built to generate steam using black liquor as fuel and that recovery of chemicals had a small place in the matter. This theory is flatly contradicted by defendant's engineer executive who had designed and built paper mills. When asked "which is the more valuable product that you got out of your recovery furnace, the chemical or the heat", he answered "the chemicals". As plaintiff's expert testified, "We burn black liquor so that we can recover the chemical. That is the primary object in the paper mill, the recovery of the chemical; and the recovery of heat in the form of steam is incidental".

Defendant's structure is a vertical furnace. At the bottom of the furnace are the primary air nozzles supplied with heated air through damper controlled ducts. It has the usual smelt outlet from the hearth. In the opposite side walls of the furnace are vertical slots through which black liquor spray nozzles project. They spray the black liquor so that a uniform distribution over the furnace is obtained. The spray nozzles are 14 feet above the hearth so that the particles may be completely dehydrated in flight. The upper section of the furnace has an enlarged offset portion with a sloping floor. At the entrance of this offset portion there are 15 secondary air nozzles supplied with heated air through a damper controlled duct.

The furnace is heated to operating temperature and the black liquor is sprayed in. The particles fall to the hearth and build up a bed of char. Combustibles in the bed are burned by the primary air. The resulting hot gases flow upward counter to the fall of the black liquor particles. The particles are substantially dried and distilled before the bed is reached. The hot gases flow through the offset portion. At the entrance of the offset portion the gases meet the secondary air and any unburned volatiles and carbons are completely burned before the boiler inlet is reached. Chemical particles settled out of the gas stream in the offset portion fall on the sloping floor and return by gravity to the hearth.

The primary air is so manipulated that a bed of char from 4 to 6 feet thick is

maintained on the hearth. The rate of burning of this bed by primary air equals the rate at which the unburned carbon falls on it from above. The chemicals are fused in the bed on the hearth. The salt cake is reduced to sodium sulphide and the smelt runs out of the smelt spout.

Defendant's spray is finely divided. The exact size of the spray particles is not known but they are relatively coarse. The real test as to defendant's spray is whether it responds to what Wagner taught. He taught that the major portion of the spray particles must be small enough to be substantially dried when they reach the char bed and are large enough to reach the char bed yet not be carried out of the furnace by the hot gases. Defendant's spray particles respond to this test.

In defendant's furnace dehydration of the spray particles with some distillation occurs shortly after the spray enters the furnace. Each spray particle is dehydrated. Some volatiles are driven off and some of the carbon burned in the flight of the particles from the spray nozzles to the bed. On the bed the remaining carbon and volatiles are burned, leaving the chemicals to flow out as molten smelt.

Defendant's total combustion air is proportioned between the primary and secondary air inlets to control the combustion in the two zones. Defendant divides its combustion air between its primary air-ports and its secondary ports with dampers to regulate the supply to each. As a result of this regulation the atmosphere is "reducing" before the offset portion of the furnace is reached. The atmosphere is "oxidizing" in the offset portion by reason of the air from the secondary air nozzles. Likewise, the Wagner furnaces have controls for the air supply. They are adjusted to get the desired results in each of the zones. The expert for plaintiff testified:

"RDQ 187. When you regulated the air for the upper and lower zones, what was it you used as a guide? A. We used as a guide the formation of the fuel bed, the general operation of the furnace from the standpoint of the smelt coming out of the furnace readily, and the reduction being good, as evidenced by chemical tests on the smelt.

"RDQ 188. And the upper zone? A. In the upper zone to keep it at such a temperature that the carry-over was not excessive and the velocity of the gases was as low as possible.

"RDQ 189. And that you could do by these dampers? A. By regulation of the air to the two zones."

Plaintiff's expert calculates that defendant's secondary air is 20 percent of the total air. A possible source of additional secondary air is the oil burner openings. The important thing is that in defendant's furnace secondary air is supplied and that it causes additional combustion at the entrance of the offset portion of defendant's furnace; that the furnace atmosphere is changed from a reducing to an oxidizing condition by this addition; and that whatever the amount of secondary air, it decreases by that amount the air that would have to be admitted through the primary air nozzles and thus decreases the gas velocity in the lower zone.

In defendant's furnace combustion air is supplied directly to each zone. Wagner supplies only part of the total air to the lower zone and then admits the remainder directly into the secondary zone. Obviously defendant also supplies a part of its combustion air to each zone "directly", just as Wagner does. Defendant does not admit all of the combustion air at the bottom of the furnace as it would do if combustion only were desired. Instead it supplies each zone with a regulated proportion of the total air whereby it obtains Wagner's advantages in chemical recovery.

Defendant has a vertical furnace. It extends from the hearth to the roof above the entrance to the boiler. It has an offset portion but this deviation from the vertical axis does not change its character. In essentials defendant's structure is like Wagner's. The offset portion of defendant's structure has the gas outlet precisely as in Wagner. The gases in each are turned from their vertical direction to a generally horizontal direction before leaving the furnace. Defendant's offset portion acts as part of the furnace because of its sloping floor. In this it is exactly like Wagner. Because of the large volume of the offset portion in each the gases are slowed down. This causes some of the chemicals to drop on the sloping floor and flow down the walls to the hearth. Defendant has offered nothing to show any real distinction from Wagner by reason of its offset portion.

Defendant's furnace has two zones. The spray and secondary air are introduced into

the upper zone as in Wagner. Defendant's results are substantially the same as Wagner's. The reduction in defendant's unit, as noted by plaintiff's expert, was 89.4 percent. The reduction in the Wagner units was from 85 percent to 90 percent. The amount of salt cake which defendant uses to make up for losses is from 280 pounds to 300 pounds per ton of pulp. In Wagner it is around 300 pounds.

■ Defendant infringes the claims of the Wagner method patent No. 2,050,400. As to claim 3 defendant has a continuous self sustaining process for spraying waste liquor. The black liquor is supplied continuously and its chemicals and heat values are recovered continuously. The process is self-sustaining, since the only heat used is that from the combustibles in the black liquor itself.

The black liquor is sprayed into the upper zone of defendant's furnace. The spray is brought into intimate contact with the rising stream of high temperature gases from the char bed and is so directed as to cause it to remain in the upper zone long enough for complete dehydration and distillation. The average spray particle travels approximately 12 feet to the hearth. Dehydration is substantially complete before the particles pass out of the upper zone. Some of the volatile combustibles are distilled in the upper zone.

Primary combustion air is supplied to the lower zone where it burns the carbon of the char bed without auxiliary fuel. The gases in the lower zone pass upwardly into the upper zone where they dehydrate the liquor spray. Secondary combustion is supplied directly to this upper zone through the secondary air nozzles and perhaps through some other openings in the furnace. This secondary air burns the combustibles in the gases in the upper zone. Finally, the hot gases are withdrawn from the upper part of the upper zone.

In claim 5 the furnace is designated as vertical and defendant's furnace responds to that term. Defendant's liquor is introduced into the upper zone at a temperature not exceeding its boiling point at the furnace pressure. Defendant's chemicals are fused on the hearth by the heat generated in the lower section. Claim 5 calls for regulation of the primary and secondary air to control the character of the atmosphere in the zones. Defendant's furnace is provided with dampers on the separate ducts which supply the secondary air and the primary air from a common blower. By this means the total air supply is proportioned between the zones to bring about different kinds of atmosphere. Finally, claim 5 calls for withdrawing the liquified chemicals from the lower section through the smelt spout. Each of the elements of claim 7 is found in either claim 3 or 5.

■ Defendant infringes claim 1 of the Wagner apparatus patent No. 1,771,829. Defendant's apparatus is used for treating paper pulp waste products. Defendant has a vertical retort. It has an upper and a lower combustion zone. These zones are in communication, since the furnace is a continuous one from hearth to outlet. The spray nozzles are in the upper zone and introduce the liquor "in finely distributed form". There are air inlets in the upper zone and other air inlets in the lower zone, by which the quantity of air to the ports may be controlled. The gas outlet is in the upper zone. The smelt spout is the outlet for the "non-gaseous residue".

## More Prior Art

Haner Patent No. 1,403,160 does not anticipate the Wagner method. The patent shows a disposal system for burning distillery waste and recovering the potash therefrom. The concentrated waste liquor is sprayed upwardly at an angle through a nozzle and some of the potash falls on the bed on an iron grate. The patent shows two doors. The lower is normally open and is like the ashpit door in the house furnace. The potash is "rabbled" on the grate. It falls through the grate to the ash bed and is removed through the ashpit door. The upper door on a level with the grate is normally closed. It is the door through which a poker may be inserted to rabble the material on the grate. The gases from the furnace ascend into a dust collecting chamber and thence to the stack. The only air admitted is through the normally open ashpit door beneath the grate. This air as in an ordinary household furnace constitutes all the combustion air contemplated in the operation. The other door described as "normally closed" was not intended to supply combustion air. There is no secondary air supply. This alone shows that the method of the Haner patent is not that of Wagner.

Realizing that the Haner patent is not an anticipation, defendant attempts to prove a prior use by Haner. Haner testified there were 6 spray nozzles spaced around the

circular furnace each projected upwardly at an angle of 45° through a piece of 6″ iron pipe set into the wall of the furnace. Haner says the spray nozzles were on the ends of 1″ pipes. The furnace had the grate, the doors below the grate and doors on a level with the grate as shown in the Haner patent. In addition, there was a second set of doors above the grate. Haner is sure there were two combustion zones and that air would be sucked in through the 6″ pipe openings to supply air directly to the upper section.

Any air which may have entered through the 6″ pipes around the spray nozzles in the Haner furnace was accidental. These openings obviously were provided merely as the necessary openings in the furnace wall for the spray nozzles. There is no evidence that Haner, prior to this suit, thought of them as sources of secondary air and there is evidence showing that he did not so recognize them. Badenhausen, a combustion engineer, did not so recognize them in 1931 when he was the engineer of the United States Industrial Alcohol Company on the problem of the disposal of the waste liquor. There is no evidence that Haner, prior to this suit, thought that air through the 6″ openings was being supplied directly to an upper combustion zone, and there is evidence showing that he did not.

While the construction of the Haner furnace is evidenced by contemporaneous drawings, the proof as to the method used with it depends solely on the testimony of one witness testifying 15 years after he last saw the furnace. The evidence shows that no one, prior to this suit, recognized that the air through the 6″ openings functioned to supply secondary combustion air or functioned to supply such secondary air directly to an upper combustion zone, if, in fact, either of these things occurred. At best, such functions were accidental and unrecognized and therefore the Haner operation can not be used to anticipate Wagner's claimed method. As the Supreme Court said: "We have now to deal with certain unpatented devices, claimed to be complete anticipations of this patent, the existence and use of which are proven only by oral testimony. In view of the unsatisfactory character of such testimony, arising from the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect them, aside from the temptation to actual perjury, courts have not only imposed upon defendants the burden of proving such devices, but have required that the proof shall be clear, satisfactory, and beyond a reasonable doubt". Barbed Wire Patent (Washurn & Moen Mfg. Co. v. Beat 'Em All Barbed-Wire Co.), 143 U.S. 275, 284, 12 S.Ct. 443, 447, 36 L.Ed. 154.

The evidence shows that no one, prior to this suit, recognized that the air through the 6″ openings functioned to supply secondary combustion air or functioned to supply such secondary air directly to an upper combustion zone, if, in fact, either of these things occurred. At best, such functions were accidental and unrecognized and therefore the Haner operation can not be used to anticipate Wagner's claimed method. Method claims 3, 5 and 7 in issue of the second Wagner patent in suit are not anticipated by any prior patent or prior use.

### Conclusions of Law

1. Wagner patent No. 1,771,829 is valid as to claim 1 thereof.

2. Wagner patent No. 2,050,400 is valid as to claims 3, 5 and 7 thereof.

3. Defendant's furnace embodies all of the elements of claim 1 of Wagner patent No. 1,771,829.

4. Defendant's method embodies all of the elements of claims 3, 5 and 7 of Wagner patent No. 2,050,400.

5. Defendant's furnace infringes claim 1 of Wagner patent No. 1,771,829.

6. Defendant's method infringes claims 3, 5 and 7 of Wagner patent No. 2,050,400.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

The patents in suit are valid, the charge of infringement has been sustained, and the plaintiff is entitled to a decree, with injunction and an accounting.