**Application of Robert MENZI.**
**Patent Appeal No. 7378.**

United States Court of Customs and Patent Appeals.
May 20, 1965.

John T. Miller, Springfield, Va., (A. Ponack, Washington, D. C., of counsel), for appellant.

Clarence W. Moore, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

RICH, Judge.

This appeal is from the decision of the Patent Office Board of Appeals, adhered to on reconsideration, affirming the rejection of process claims 9, 11, 14, and 18 and product-by-process claim 21 in application serial No. 799,087, filed March 13, 1959, for "Hydrolysis of Protein Substances." No claim has been allowed.

Appellant's invention relates to the hydrolyzing of protein substances to produce *partially* hydrolyzed products useful as meat-flavor seasonings in food preparations. Further details and various advantages of the invention are aptly described in the following excerpt from appellant's brief:

"Proteins are complexes, which contain alpha-amino acids united by peptide linkages (–CO.NH–). By hydrolysis with either water or mineral acid, the protein structure can be split to produce, first, polypeptide compounds, i. e. complexes of amino acids of lesser size than proteins, and finally, upon complete hydrolysis, the amino acids in elemental form. Depending upon the strength of the hydrolyzing agent and the reaction time and temperature, substantially complete hydrolysis will eventually occur leaving a mixture of various amino acids.

"Many amino acids are characterized by unpleasant odors and tastes,

and the *complete* hydrolysis of meat proteins results in a product with diminished meat-flavor characteristics. In order to overcome these deficiencies, Appellant has invented a process whereby protein can be hydrolyzed to effect a *partial* breaking-up of the protein structure into polypeptides without a concomitant *complete* hydrolysis which produces undesirable amino acids. A product obtained by such a process possesses significant advantages over the previously known products. While retaining a strong characteristic meat-like flavor and aroma, no undesirable amino acid material is present to contaminate the partially hydrolyzed material. One particularly strong amino acid to be avoided is threonine, which during acid hydrolysis is partially changed to α-keto butyric acid, which has an unpleasant odor and taste.

"The essence of the Appellant's invention is the recognition that *partial* hydrolysis, while *avoiding total* hydrolysis, is the critical factor in producing desirable meat flavorings. Accordingly, the Appellant first reacts a protein substance with hydrochloric acid causing the hydrolysis to begin. Then, before complete hydrolysis can occur, analyses are performed on the admixture to determine the nitrogen content. When the correct total nitrogen to amino nitrogen ratio is attained, the acid-hydrolysis produced material is separated from the main body of protein substance and the acid is immediately separated by distillation thereby interrupting the hydrolysis and leaving only the polypeptide residue, which is the desired food-flavoring product. Critical to the process is the *separation* of the hydrolysis product from the acid and protein mixture *before complete hydrolysis occurs.* The Appellant has found that such separation must be made *when the ratio of total nitrogen to amino nitrogen in the product is less than ten but greater than one.* At such ratios, a product is obtained which is substantially free of objectionable amino acids and is primarily composed of polypeptides."

Claim 9, the broadest process claim, defines a process for hydrolyzing a protein substance which comprises mixing the substance with hydrochloric acid, heating the mixture to a temperature of from 90°C. to 140°C. to promote the hydrolysis, separating the resulting hydrolysis products from the mixture when the total nitrogen to amino nitrogen in the products is less than ten and more than one, and rapidly evaporating the acid from the separated hydrolysis products, whereby they "are not converted to amino acids to any great extent."

Claim 11 defines a process as in claim 9 wherein the evaporation of the acid from the separated hydrolysis products is carried out in vacuo at about 60°C.

Claim 14 is specific to the process of claim 9 wherein the protein substance is an extracted meat.

Claim 18 defines the process more specifically wherein 9 parts by weight of meat protein and about 11 parts by weight of about 6-normal hydrochloric acid are employed. The resultant mixture is heated for about 45 minutes to about 110°C. The liquid containing the hydrolysis products is filtered and the filtrate obtained is heated at about 60°C. in vacuo to evaporate the hydrochloric acid. The pH of the acid-free product is then adjusted to about 5.

Claim 21 defines "A hydrolyzed protein concentrate having a taste similar to that of meat broth and obtained by" the steps and conditions defined by claim 9, followed by "adjusting the pH of the resulting product to about 5, and heating the product at a pH about 5 to concentrate the same."

Both appellant and the solicitor agree that the questions involved in the appeal are whether the claimed product and processes would be obvious to one of ordinary skill in the art within the meaning

220

of 35 U.S.C. § 103 from the teachings of the sole reference which is:

Hall     2,414,299     Jan. 14, 1947

Hall discloses a method of producing flavoring materials by the hydrolysis of protein substances by first *completely* hydrolyzing a protein to amino acids, and then, in the presence of these amino acids, *incompletely* hydrolyzing fresh protein materials. Sodium ions are added to the ultimate hydrolysate for flavor improvement.

More specifically, Hall completely hydrolyzes a protein material by heating in a hydrochloric acid solution. The free hydrochloric acid and water are then removed and fresh protein is added to the remaining mass. Partial hydrolysis of the fresh protein then takes place *in the presence of the amino acids*. The amine-hydrochlorides present are purportedly responsible for the subsequent partial hydrolysis of fresh protein.

Considering first product claim 21, the board took the position that it was old to use *completely* hydrolyzed protein as a flavoring substance, the Hall specification having acknowledged that "amino-acids for use as flavoring" had long been effected "by enzymatic, or alkaline, or acid hydrolysis of protein," that Hall teaches the use of a *mixture* of completely and incompletely hydrolyzed proteins as flavorings, and that appellant has taken another, but obvious, step in this history, viz., the use of *incompletely* hydrolyzed protein as a flavoring agent. The board concluded this "final step" was obvious within the meaning of section 103 because Hall "attributes the good flavor of his product to the incompletely hydrolyzed protein."

We have considered appellant's arguments regarding the alleged use of "hindsight" analysis by the Patent Office, regarding the fact that Hall himself apparently did not recognize the advantages of eliminating essentially all amino acids from the product, regarding the importance in patent law of the "last step" as stressed by the Supreme Court in The Barbed Wire Patent, 143 U.S. 275, 282, 12 S.Ct. 443, 36 L.Ed. 154, 158, regarding the alleged "superior properties" of the claimed product, and many others, but we agree with the board. The Hall patent says (all emphasis ours):

"I have found that amino-acid protein hydrolysate at a pH of meat in the presence of sodium ions, has a flavor *which is improved when there is present additional material which is the product of an incompleted hydrolysis of protein,* including the proteoses, peptones, peptides and polypeptides.

\*   \*   \*   \*   \*   \*   \*

"A particular object of the invention is to hydrolyze protein substantially completely to amino acids, then in the presence of said amino acids *incompletely to hydrolyze protein to provide additional flavoring material.*

\*   \*   \*   \*   \*   \*

"The second and short hydrolysis provides proteoses, peptones, peptides, and polypeptides, *giving a superior taste to the product.*"

Notwithstanding the fact, upon which appellant heavily relies, that Hall's product always consists of a *mixture* of intermediates and the less desirable amino acid end products and that sodium salts are present, which Hall specifically says contribute "in part" to the desired flavors (a not too surprising disclosure), we believe that the above quotations from Hall support the board's decision that a meat-flavoring agent consisting primarily of an incompletely hydrolyzed proteinaceous material would be obvious, wherefore claim 21 is unpatentable over Hall.

The board said:

"We agree with appellant that Hall does not obtain his incompletely hydrolyzed protein by using a process as claimed but it appears obvious to us that one skilled in the art could use the same process for obtaining the incompletely hydrolyzed protein that Hall uses to obtain the completely hydrolyzed protein and and the latter has a marked resemblance to appellant's process."

We also agree with the board on this point. While it is true, as contended by appellant, that Hall's second hydrolysis, wherein he produces incompletely hydrolyzed protein, differs in a number of ways from appellant's process, nevertheless, Hall's first hydrolysis differs from appellant's in only one principal regard, namely, *time* of reaction. Temperature, reactants, and all other conditions are essentially the same. To interrupt the reaction of Hall designed to produce a completely hydrolyzed product would appear to constitute an obvious method of obtaining an incompletely hydrolyzed, intermediate product. The fact that Hall always produces a completely hydrolyzed product in this step and the fact he uses a different method for obtaining *his* incompletely hydrolyzed protein, does not persuade us otherwise.

Furthermore, Hall also teaches that "To stop a hydrolysis midway, for example, in the course of the complete hydrolysis will be to produce a fractional amount of amino acids and a fractional amount of intermediate products." Appellant's claims do not preclude the production of *some* amino acids, as will be discussed more fully below.

Appellant's brief asserts that "the important feature to be noted is that the process of hydrolysis is discontinued at the time when the ratio of total nitrogen present to the amino nitrogen present is less than ten but greater than one." (We note that the expression "greater than one" simply means that *not all* of the nitrogen in the hydrolysis products is in the form of amino nitrogen, but a great amount of it could be in that form.) Appellant insists that this range of ratios, recited in all the claims on appeal, is "critical," but it is our view that the record before us provides no basis for a finding that this limitation renders the claims patentable over the art. During prosecution appellant presented, by attorney's argument, the results of various tests—chemical tests to analyze and compare the products of appellant's process and of the Hall process and organoleptical tests by twelve professional taste testers. Appellant offered confirmation by affidavit but the examiner said the data did not require confirmation. The board said the tests showed that "appellant's incompletely hydrolyzed protein differs substantially from Hall's mixture," and we agree, but we do not think these differences establish unexpected properties in appellant's product to render either it, or the process for obtaining it, unobvious within the meaning of 35 U.S.C. § 103. Undoubtedly appellant's product is "superior," but we believe that would have been entirely expected, in view of the three passages above quoted from the Hall disclosure.

The decision of the board is affirmed.

Affirmed.

SMITH, Judge (concurring).

The majority opinion affirms the decision of the board without comment on the legal issue raised by the board's reliance on In re Larsen, 49 CCPA 711, 292 F.2d 531. While I agree with the result reached by the majority, I do so on the basis that I do not consider the Larsen decision to be applicable. Here, it seems to me, Hall clearly teaches that the incompletely hydrolyzed protein alone is an improved flavoring material since it actually improves the flavor of a known flavoring material, and that it is the combination of the incompletely hydrolyzed protein with the hydrolyzed product which is essential to the Hall product. It is clear from a consideration of the Hall reference that the improved flavoring results from the presence of the partial hydrolysates. It is also clear from the method discussed in appellant's specification and claimed in claims 9 and 21 that appellant's method of hydrolysis necessarily converts some of the protein to amino acids, the representation being merely that this is not done "to any great extent." Presumably this is related to appellant's separation of the hydrolysis products "when the ratio of total nitrogen to amino nitrogen in the products is less than ten and more than one." However, it is noted that this limitation does not appear in claim 18.

Thus, it seems to me that where both Hall and appellant are dealing with the hydrolyzing of proteins, and the distinction resides in the relative proportions of the partial hydrolysates to the amino acids, these similarities make it obvious to one of ordinary skill in the art to practice the Hall process according to the method claimed in appealed claims 9, 11, 14 and 18 and produce the concentrate claimed in claim 21. The differences between the Hall disclosure and the invention covered by appellant's claims have been considered but they do not seem to me to be such as would have made appellant's invention as a whole unobvious at the time it was made.